Mrs. Elvira S. ROLFE and Mrs. Bernice L. Peebles, Plaintiffs,

v.

COUNTY BOARD OF EDUCATION OF LINCOLN COUNTY, TENNESSEE, etc., et al., Defendants.

Civ. No. 781.

United States District Court
E. D. Tennessee,
Winchester Division.

July 20, 1966.

Supplemental Opinion Aug. 30, 1966.

Supplemental Opinion and Order
Nov. 29, 1966.

Avon N. Williams, Jr., Nashville, Tenn., for plaintiffs.

Robert W. Stevens, Fayetteville, Tenn., for defendants.

## MEMORANDUM OPINION

NEESE, District Judge.

This is an action by two former teachers at West End School in Fayetteville, Tennessee, whose positions were abolished by the defendant Board of Education three weeks after the 1965–1966 school term had commenced, following the purported desegregation of the public schools of Lincoln County, Tennessee for the purpose of " * * * compliance with the civil rights law * * *." The plaintiffs seek, *inter alia*, compensation of which they claim they were wrongfully deprived and an injunction requiring the defendants to reinstate them as teachers in the system operated by the defendants. It is claimed that the plaintiffs and others in similar situations were discharged because of their race.

The jurisdiction of this Court was properly invoked on April 6, 1966. 28 U.S.C. §§ 1331 and 1343(3); 42 U.S.C. §§ 1983, 1981 and 2000d. The Court ordered the defendants to show cause on April 15, 1966 why the injunction should not issue. Hearing on the order was reset, on a showing by the defendants of good cause, and was heard by the Court without a jury, on April 20, 1966. The questions involved have now been briefed well by counsel for the contesting parties and have been carefully reviewed by the Court.

While the matter remained under advisement by the Court, counsel supplied a photographic reproduction of an opinion of the United States Court of Appeals for the Fourth Circuit, filed June 6,

1966, which appears to provide the determinative precedent for the adjudication of the issue at bar. Therein, a crucial point was the fact that the Hendersonville, N. C. City Board of Education had determined that when there was a sharp decrease in enrollment of Negro students and the consequent closing of an all-Negro consolidated school, the Negro teachers affected lost their jobs and, therefore, " * * * stood in the position of new applicants." Here, the defendants considered all non-tenure teachers [1] in its system as "new applicants" each school year. There was a sharp decrease in enrollment at West End School and an attendant decrease in the average daily attendance, to the extent that state aid was available for only eleven teachers there, instead of the previous allotment of 15 teachers. When this occurred, the defendant Board summarily declared the positions abolished. In this connection, the appellate court observed:

"The Board's conduct involved four errors of law. First, the mandate of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) forbids the consideration of race in faculty selections just as it forbids it in pupil placement. See Wheeler v. Durham City Board of Education, 346 F.2d 768, 773 (4 Cir. 1965). Thus the reduction in the number of Negro pupils did not justify a corresponding reduction in the number of Negro teachers. Franklin v. County School Board of Giles County, 360 F.2d 325 (4 Cir. 1966). Second, the Negro school teachers were public employees who could not be discriminated against on account of their race with respect to their retention in the system. Johnson v. Branch, 364 F.2d 177 (4 Cir. 1966), and cases therein cited, wherein the Court discussed the North Carolina law respecting

teacher contracts and the right of renewal. * * * " [The remainder of the opinion in this connection is not germane to the issues with which this Court is now confronted.] Chambers v. Hendersonville City Board of Education (C.A.4th 1966), 364 F.2d 189, 192.

Until the school year, 1965–1966, Lincoln County public schools were operated under a compulsory biracial system in open defiance of the law for nearly a decade. Brown v. Board of Education, supra, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180. No action was taken by the defendants or their predecessors after being advised by the Tennessee Commissioner of Education, on June 24, 1955, of the declaration of the law of the land by the Supreme Court of the United States, although, at its meeting of August 15, 1955, the defendant Board went " * * * on record as adopting * * * the *Free Choice Plan* of school attendance for negro and white children in Lincoln County, to take effect with the school year 1956–57 embodying the principles suggested by this name and instruct[ed] the Superintendent of Education to proceed immediately to work out the details of this plan for presentation to the Board at the earliest practical time." Despite urgings for appropriate action in the meantime, there appears to have been no further discussion of desegregation until August 3, 1964; and, as late as January, 1965, the Board members were still unable to agree on a plan. The plan was eventually rearranged in the latter part of April, 1965 to the satisfaction of the Board members and was formally adopted on May 10, 1965. This was more than eight years after the Tennessee Supreme Court had added a supplemental declaration of the law regulating public school operations. Roy v. Brittain (1956), 201 Tenn. 140, 297 S.W.2d 72.

---

1. Under the "Policies, Rules and Regulations" of the Lincoln County Board of Education (1964–1965), a teacher elected to the system for the first time remained on probation for a period of three years and attained permanent tenure if elected for the fourth term and had a college degree and proper certification by the Department of Education of the State of Tennessee.

It was only when faced with the loss of $136,232.72 in federal aid funds, receipt of which was contingent on compliance with the Civil Rights Law,[2] that the defendants adopted a plan of desegregation. Interestingly, all the remainder of Lincoln County lying outside of the county seat community of Fayetteville was zoned geographically, while school children residing within Fayetteville were given freedom of choice to attend any school for which the students were eligible.

The inference follows logically that this was hardly more than "a Hobson's choice". The defendant superintendent Mr. Norman was well aware, from his experience as an educator, that no child of the Caucasian race was likely to elect to begin attending an all-Negro school, and that Negro parents would be discouraged from transferring their children away from an all-Negro school because of the probabilities that teachers of that race would be displaced as a result.

The defendant Mr. Norman and the defendant Board members were so acutely attuned to the situation that they were able to anticipate a considerable decrease in enrollment system-wide. For this reason, fewer teachers were hired for the 1965-1966 term than for the preceding year.[3] There was, in fact, a decrease in enrollment of about 200 (two-thirds of whom were of the Caucasian race) when the term began on August 23, 1965.[4]

Only 37 Negro students registered at the formerly all-Caucasian Central High School in Fayetteville before the commencement of the new term. 135 Negro children returned to West End School. However, on the opening day of the new term, about 90 Negro students departed West End and enrolled in Central. When, within ten days, ten more students followed suit, decimating the all-Negro student body at West End, it became obvious that four teachers were no longer needed in the system. Ironically, the only school adversely affected was West End.

On the faculty at West End, in the high school department at this time were the plaintiffs Mrs. Rolfe and Mrs. Peebles. Mrs. Rolfe holds the degree of bachelor of science and is certified by the State of Tennessee to teach general science, physics, chemistry, biology, and grades one through nine in elementary school.[5] She had taught elsewhere for six years before coming to Lincoln County for the school term, 1963-1964, in response to a need for a science instructor who could also give instruction in Spanish.[6] She was re-employed and had taught in the school year, 1964-1965, had accepted re-election for the 1965-1966 school year, and was teaching courses in general science and physics.

Mrs. Peebles, a native and (until discharged) a life-long resident of Lincoln County, holds a bachelor's degree in, and is certified by the State of Tennessee to teach, mathematics. She had taught elsewhere for two years before joining the Lincoln County system at the same time as Mrs. Rolfe. She, also, was re-employed and had taught in the school year, 1964-1965, and, likewise, had accepted re-election for the 1965-1966

2. Economics appears to have been more effective in the solution of these problems than moral or legal suasion.

3. 20 new teachers were brought into the system for the term.

4. Rural schools opened July 19, 1965.

5. The defendant Mr. Norman expressed an interest in the plaintiffs even at the time of the hearing, but he did not know until the hearing that Mrs. Rolfe was certified as a teacher in the elementary grades, although it appears that Mrs. Rolfe delivered her certificate of that qualification to his office in the Spring of 1965.

6. There was no course offered in Spanish at West End, but Mrs. Rolfe gave informal instruction in her spare moments to all students who were interested.

school year, and was teaching courses in mathematics at West End.

The defendants were confident of approval by the United States Department of Health, Education and Welfare of their plan of desegregation and had proceeded on the expectation of its approval since its adoption on May 10, 1965. Such approval was not forthcoming, however, until August 31, 1965.

One week afterward, on September 7, 1965, the defendant Board convened in regular monthly session, and " * * * reviewed the whole integration problem, and then it proceeded to take the necessary steps to correct its teaching load to the amount [sic: number] of positions it had. * * * " There were transfers from one school to another and from one position to another. No teacher of the Caucasian race was discharged; [7] of the non-tenure Negro teachers in the system, only one remained when the Board completed the taking of " * * * the necessary steps to correct its teaching load * * *." Four members of the all-Negro faculty at West End were discharged,[8] effective at the end of the following school day.

Although the defendants contend that teachers are elected for employment within the system,[9] as opposed to a particular school, and, although the defendant Board had provided in its plan of May 10, 1965 that all teachers would be integrated at the beginning of the 1965–1966 school year,[10] only members of the West End faculty were considered for readjustments or discharge, and the only comparison of the effectiveness of the respective teachers in the system was the comparison of each West End teacher with other West End teachers.

Considering all non-tenure teachers in the system as "new applicants"[11] for employment each year, and having flaunted its own plan by assigning only Negro teachers to West End School, and in considering only the comparative qualifications of members of the West End faculty, obviously, the Board limited its candidates for termination of employment to the non-tenure Negro teachers at West End.

The Board did not exclude from its consideration in making such comparison the seniority of the respective Negro non-tenure teachers at West End " * * * * altogether * * * *", but it only " * * * * figured in * * *." Other factors considered were:

"The grades that would be most affected;

"What combination of grades you would have to use in dismissing a teacher; whether or not you could move some students to the next teacher above, or to the next teacher below * * *."

Under the requirements of Tennessee law, the Board elected the teachers it believed would be needed in the immediately succeeding year 30 days before the expiration of the current school year. At this time each year, according to Mr. Norman, all teachers in the system were compared with all the others as to effectiveness. However, with the assignment of an all-Negro faculty to West End—the one school which Mr. Norman testified would "be hurt" in the implementation of the Board's plan—this pre-school-year

---

7. A teacher of the Caucasian race was discharged because of decrease in enrollment in an elementary school the following January.

8. Two of this number were subsequently placed elsewhere in the system.

9. The Board reserved unto itself the right to transfer any employee to another school or position within the system when deemed " * * * * for the welfare of the children involved."

10. Despite this plain statement in its plan, the defendants decided to keep the faculties at West End School and Central High School segregated during the school year, 1965–1966 " * * * for no particular reason. * * * It wasn't a part of our integration plan * * *."

11. Included in the Board's plan was the policy that " * * * [a]ssignments and consideration of new applications will not be based upon considerations of race, color or national origin."

comparison was of no benefit at all to the plaintiffs when the moment of decision arrived.

Mr. Norman conceded that there are non-tenure teachers in the elementary schools of Lincoln County with less qualifications than those possessed by Mrs. Rolfe. Eight such teachers were junior to Mrs. Rolfe in point of service with the system. She, however, was the junior science instructor in the system. He could not compare the qualifications of Mrs. Peebles with other mathematics instructors in the system, and asserts, despite all the foregoing that he could not foresee the subsequent abolishment of Mrs. Peebles' position at West End when he engaged, less than a month earlier, a newcomer to the system to teach solid geometry, trigonometry and algebra I at Central High School.

The aforementioned "newcomer" soon resigned, and the qualifications of Mrs. Peebles were considered against those of Mrs. Martha Crawford, a former teacher there who had left the system until "a home situation cleared up". The two teachers were compared carefully and at length, and the Board decided that Mrs. Crawford's qualifications " * * * were a little better * * * " than Mrs. Peebles'. Included in the comparison was the fact that Mrs. Crawford had passed one course in calculus which Mrs. Peebles had been required to repeat several times in college, although Central High School has never offered, and does not now offer, calculus.

At a future time, Mr. Norman directed an assistant to contact Mrs. Peebles about another position in the system at her former salary. Mrs. Peebles testified that she was called on the telephone about the position but that her caller " * * * didn't know the exact kind of job, * * * and she didn't know the exact salary. * * * "

Both Mrs. Rolfe and Mrs. Peebles had been complimented in their respective work at West End by the principal. Neither had ever received any reprimand or complaint about their performance of their respective assignments.

█ With this background, the Court is of the opinion that the reasonable inferences which logically follow cast upon the defendants the burden of justifying its conduct, which resulted in the discharging of Mrs. Rolfe and Mrs. Peebles, by clear and convincing evidence. " * * * Innumerable cases have clearly established the principle that under circumstances such as this where a history of racial discrimination exists, the burden of proof has been thrown upon the party having the power to produce the facts. * * * " Chambers v. Hendersonville City Board of Education, supra.

While the Court is impressed with the myriad of problems involving public opinion which probably accompanied the start, such as it is, that has been made in the conversion of the Lincoln County system into a nonracial operation, the Court is also struck with the impact of the lack of good faith exhibited by the defendants in the purported implementation of its plan. It is reasonable to infer that the defendants would have continued, in the absence of litigation, to defy the unambiguous mandate of the law had the Congress not employed the device of economic sanctions to inspire obedience; that the plan eventually adopted was the minimum which would qualify the defendants for federal funds; that the bi-parte type of plan had as its purpose the postponement of assigning Negro teachers to Central High School; and, that the plan continued to be the subject of debate until some ingenious method could be devised to penalize the Negroes of Lincoln County, locally prominent, through members of their race who are in the teaching profession, for becoming the beneficiaries of a program of equalizing the citizenship in this manner.

The defendants admit, in part, their bad faith, i. e., they promulgated a plan providing for the immediate integration of their faculties when it was their stated purpose to maintain segregated faculties

in the two principal schools in Fayetteville. They failed to establish definite objective standards for the employment and retention of teachers for application to all teachers alike; instead, they designed a pattern which could only result in discrimination against Negro teachers.

"Oh, what a tangled web we weave,
When first we practice to deceive!" [12]

Now, the availability of funds in the future from the federal government is placed in doubt. There could be an effort to recoup the amount the County has already received. Reinstatement of the plaintiffs may bring problems of faculty overloading. Additional litigation may result. Compensation must be paid when no services were performed. Lincoln County may be compelled to pay for services for which it can receive no reimbursement in the form of state aid. Even a tax increase may follow. This could be a high price for the citizens of Lincoln County to pay for their brief moment of surcease from the doing of equal justice among all. Whatever fault there be must be accredited to those who prevailed on the members of the Lincoln County Board of Education to ignore their oaths to uphold the law for ten years.

It is inconceivable to the Court that, had the defendants established definite objective standards for the retention of its teachers and applied those standards to all its teachers alike, without distinction as to race, that either of these plaintiffs would have suffered the loss of her employment. The Court does not insist that seniority should be the determining factor in deciding who shall go and who shall remain, but in the ordinary habits of life, the Court does believe that, had two persons been equated on the same standards, the more junior is the more likely to leave.

The professional among the defendants, Mr. Norman, concedes that these plaintiffs were well-qualified. Had this not been true, there could have been no justification for their employment and continued re-employment to teach Negro children. But there were no standards. Except for the protection afforded the teachers who had attained tenure status under Tennessee law, the flexibility was so great that these teachers could be hired or fired to accommodate the vacillating whims of a majority of the defendant Board. Teachers are professional persons. They should not be left in a position to be buffeted about by every changing wind. The day of acquiring personal power through control of our schools is gone.

The defendants were derelict in not fixing standards by which to employ and discharge non-tenure instructors should the occasion arise. The standards could have included:

| | |
|---|---|
| personality | philosophy |
| reputation | general appearance |
| physical defects | attitude |
| manner of speech | optimism |
| love of children | age-group interests |
| cooperability | sense of humor |
| disciplinary ability | parent-student reactions |

general appraisal.

———◇———

Without any fixed standards at all, this Court cannot say that the defendants have carried the burden of proving by a preponderance of the evidence that they acted properly in comparing these plaintiffs with others and in de-

12. Introduction to Marmion, Canto VI, Stanza 17, Sir Walter Scott.

ciding to dismiss the plaintiffs. The comparison only with other Negro teachers on the same faculty was so restrictive that it resulted in discrimination against these plaintiffs. Cf. Franklin v. County School Board of Giles County, D.C.Va. (1965), 242 F.Supp. 371, 374.

■ So finding and concluding, the Court will issue a mandatory injunction for the defendants forthwith to reinstate the plaintiffs to their most recent positions and salaries in the Lincoln County school system and to continue such employment of each plaintiff unless this Court, on good cause shown, modifies the injunction to permit dismissal of one or both such persons. The injunction will also require the defendant Board, within 90 days from its issuance, to establish definite objective standards for the employment and retention of teachers and to apply such standards to all tenure teachers, on the one hand, and non-tenure teachers, on the other, consistently with the due process and equal protection clauses of the Constitution of the United States.

The clerk will place this case on the trial docket to be sounded at the Federal Building, Winchester, Tennessee, on Monday, August 1, 1966, for the purpose of considering the setting of a trial and pre-trial conference on the issue of the compensation to which each plaintiff is entitled.

Counsel will forthwith undertake to agree on and submit an appropriate order herein for the Court's consideration, and, failing to so agree and submit by July 28, 1966, will so apprise the Court. Said order shall provide that this action shall remain open for the Court's supervision until the compliance of the defendants with the defendant Board's plan of desegregation of May 10, 1965.

### SUPPLEMENTAL OPINION

The Court has considered the additional evidence adduced herein on August 26, 1966, the stipulations in and subsequent to the pretrial order of August 18, 1966, as thereafter amended and supplemented, and previous findings and conclusions. See memorandum opinion of July 20, 1966. From all this, the Court finds:

(1) The plaintiff Mrs. Rolfe would have received an additional amount of $3,988.56 as salary from the defendants in the school year 1965–1966 had she not been wrongfully discharged.

(2) The plaintiff Mrs. Rolfe earned within the aforementioned period from other employment an aggregate of $1,425.25.

(3) Contrary to the dictum in footnote 5, memorandum opinion of July 20, 1966, Mrs. Rolfe has not now carried the burden of proving that she delivered her certification to teach in the elementary grades to the office of the defendant Mr. Norman in the Spring of 1965, nor that this certificate was mailed to her from said office subsequent to her dismissal.

(4) The plaintiff Mrs. Peebles would have received an additional sum of $3,173.60 as salary from the defendants in the aforementioned school year had she not been wrongfully discharged.

(5) The plaintiff Mrs. Peebles used reasonable diligence to seek other employment as a public school teacher following her aforementioned wrongful discharge.

■ The burden of proving mitigation of damages was on the defendants. International Correspondence School v. Crabtree (1931), 162 Tenn. 70, 34 S.W.2d 447 [1], 78 A.L.R. 330; John S. Doane Co. v. Martin, C.C.A.1st (1948), 164 F.2d 537; News Publishing Co. v. Burger, C.A.Tenn. (1911), 2 Tenn.C.C.A. (Higgins) 179; cf. also Canning v. Star Publishing Co., D.C.Del. (1955), 130 F.Supp. 697.

■ The respective plaintiffs are entitled to recover for the wrongful breach of their respective contracts of employment the sum which would have come to each plaintiff had the contract continued, less what each plaintiff might have earned in some other suitable employment by reasonable diligence. God-

son v. MacFadden (1931), 162 Tenn. 528, 39 S.W.2d 287. Each may also be entitled to recover all or a portion of their counsel fees.

 It has heretofore been found by the Court that the defendants have been guilty of " * * * a long-continued pattern of evasion and obstruction * * * " of the desegregation of the public schools system of Lincoln County, Tennessee. In such event counsel fees are allowable, and disallowance of such fees is an abuse of judicial discretion. Bell v. School Board of Powhatan County, Virginia, C.A.4th (1963), 321 F.2d 494, 500. Unless the school authorities' " * * * unreasonable [and] obdurate obstinacy * * * " compels the bringing of an action, the Court does not abuse its discretion in refusing to allow counsel fees. Bradley v. School Board of the City of Richmond, C.A.4th (1965), 345 F.2d 310.

 It does not appear that the defendants have violated any order of this Court or acted improperly since the original findings of July 20, 1966. Cf. Monroe v. Board of Com., City of Jackson, D.C.Tenn. (1965), 244 F.Supp. 353, 366. Although the defendants have not yet established definite objective standards for the employment and retention of teachers in and for the Lincoln County, Tennessee public school system as ordered, the 90-day period for such action has not yet expired. Further, it is undisputed that the faculties of all but one of the 15 schools in that system have now been integrated to some degree by the defendants. This indicates good-faith, even if belated, implementation of the defendants' plan of desegregation. Under all these circumstances, the Court is of the opinion, finds and concludes that the defendants' contribution to the respective counsel fees of the plaintiffs should be limited to $250 in each instance.

Accordingly, the clerk will enter judgment against the defendants: in favor of the plaintiff Mrs. Rolfe for $2,563.31 and $250 as a contribution toward her reasonable counsel fees, and in favor of the plaintiff Mrs. Peebles for $3,173.60 and $250 as a contribution toward her reasonable counsel fees.

*Other matters are reserved.*

## SUPPLEMENTAL OPINION AND ORDER

In the course of these proceedings, it came to the attention of the Court that the defendant Board of Education had not established definite objective standards for the employment, on the one hand, and retention, on the other, of teachers in and for the Lincoln County, Tennessee public school system. Thus as a part of the injunctive relief granted, the defendant Board was ordered to establish such standards and to apply same to all tenure teachers, on the one hand, and all nontenure teachers, on the other, consistently with the due process and equal protection clauses of the Constitution of the United States.

On October 8, 1966, standards were adopted by the defendant Board. The plaintiffs and all members of their class were allowed a period in which to register exceptions with the Court to these standards. Exceptions were filed on November 3, 1966, and the Court has considered these standards and exceptions.

It appears to the Court that the standards which have been established by the defendant Board are applicable to all tenure and nontenure teachers, respectively, alike. This was the objective of the Court in requiring the adoption and filing with the Court of such standards. The rationale of the exceptions seems to this Court to be that the standards might conceivably be employed by the Lincoln County school authorities adversely to the respective interests of these plaintiffs at some future time.

 These are mere hypothetical forebodings on the part of the plaintiffs. They do not present a justiciable con-

troversy which is appropriate for judicial inquiry at this time. " * * * Courts deal with cases upon the basis of the facts disclosed, never with non-existent and assumed circumstances. * * *" Associated Press v. National Lab. Rel. Bd. (1937), 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953, 960 (headnote 3).

■■■■■ " * * * A controversy in [the] sense of [the exercise of the judicial function in the determination of controversies to which under the Constitution the judicial power extends] must be one that is appropriate for judicial determination. * * * A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic * * *. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. * * * It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. * * *" Aetna Ins. Co. of Hartford, Conn., v. Haworth (1937), 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, 621–622 (headnotes 2, 3), 108 A.L.R. 1000, rehearing denied (1937), 300 U.S. 687, 57 S.Ct. 667, 81 L.Ed. 889.

Thus, on the basis of the exceptions of these plaintiffs to the standards fixed by the defendant Board, no controversy exists between the plaintiffs and the defendants which is justiciable herein, and the exceptions are, at this time, disallowed. In the light of the public interest in such standards, however, and because the Court is of the opinion that no adjudgment would be proper at this time, the motion of the defendants for approval of the standards on file also is overruled.

No valid exceptions to the aforementioned standards having been filed within the time prescribed, in keeping with the Court's order of October 14, 1966, this action will now be retired from the active docket of this Court.