**Linda WILLIAMS, by her father and next friend, Martin Williams,**

v.

**George KIMBROUGH, President, School Board of Madison Parish; Madison Parish School Board; and M. A. Phillips, Superintendent of Schools of Madison Parish.**

**Civ. A. No. 11329.**

United States District Court
W. D. Louisiana,
Monroe Division.
Jan. 28, 1969.

See also 5 Cir., 392 F.2d 721.

Murphy W. Bell, Baton Rouge, La., Jack Greenberg, Norman Amaker, and William Bennett Turner, New York City, for plaintiff.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, Carroll Buck and Harry Kron, Asst. Attys. Gen. of Louisiana, Baton Rouge, La., Thompson L. Clarke, Dist. Atty., Sixth Judicial District, St. Joseph, La., for defendants.

## DECISION GRANTING MOTION TO ADD INTERVENING PLAINTIFFS AND FOR FURTHER RELIEF

BEN C. DAWKINS, Jr., Chief Judge.

Four former elementary school teachers, of the Negro race, seek intervention in this action, alleging that defendants dismissed them from professional employment as such in violation, first, of an earlier order of this Court implementing the model school desegregation decree in United States v. Jefferson County Board of Education, 372 F.2d 836, affirmed with modification on rehearing en banc, 380 F.2d 385, cert. den. sub nom. Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); and second, in violation of their rights under the equal protection and due process clauses of the Fourteenth Amendment.

This suit, which originally was filed August 20, 1965, as a class action on behalf of Negro students in Madison Parish, sought injunctive relief against defendants' operation and administration of its public schools on a racially discriminatory basis. All that heretofore has transpired in this action, now before the United States Court of Appeals, Fifth Circuit, is not relevant here and thus need not be related. In its present aspects, however, there is involved a portion of our April 7, 1967 decree, conforming exactly with the model decree set forth in *Jefferson*. Section VIII(b) of that decree reads:

"(b) *Dismissals.* Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. *In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color.* A report containing any such proposed dismissals, and the reasons therefor, shall be filed with the Clerk of the Court, serving copies upon opposing counsel, within five (5) days after such dismissal, demotion, etc., as proposed." (Emphasis added.)

June 28, 1968, plaintiffs and Mrs. Nella Williams, Mrs. Doris Cockerham, Mr. Hosea Atkins, and Mrs. Flora Martin filed a motion to add them as intervening plaintiffs. The motion also sought further relief, as set forth *infra.* The motion alleged that Williams, Cockerham, Atkins, and Martin were Negro teachers dismissed from their teaching positions in violation of that portion of our order of April 7, 1967, and of the equal protection and due process clauses of the Fourteenth Amendment. The prayer for relief sought, *inter alia*, immediate reinstatement to their teaching positions, an award of back pay, together with compensation for any loss suffered by them as a result of their allegedly unlawful discharge, plus reasonable attorneys' fees.

A hearing was held on this motion July 24, 1968. The record was later supple-

mented by an oral deposition given by Brutus Noland Jackson, principal of Wright Elementary School in Tallulah, Louisiana, (Wright), a formerly all-Negro school where all movants here were teaching at the time of their dismissals.

The combined motion for further relief and for addition of the four teachers mentioned as intervening plaintiffs, in effect, has as its principal object the enforcement of our April 7, 1967, decree, as set forth supra. Thus there are "question[s] of law or fact in common," Rule 24(b), F.R.Civ.P.; and since allowing this intervention would not "unduly delay or prejudice the adjudication of the rights of the original parties," the motion for intervention, timely filed, therefore is granted.

Before proceeding to discussion of the facts surrounding each dismissal, the following background information should be set forth. At the time of the dismissals, none of the teachers here had taught the necessary three years to acquire tenure status under Louisiana law. Thus by L.S.A.–R.S. 17:442, they could be dismissed simply "upon the written recommendation of the parish or city superintendent of schools, as the case may be, accompanied by *valid* reasons therefor." (Emphasis added.)

Each of the dismissals took place in the spring of 1968, when the School Board (Board) was preparing for faculty integration for the following year, as ordered. In the 1968–69 school year, all schools in Madison Parish, except two,[1] either integrated their faculties for the first time or increased their numbers of teachers of the opposite race. It is particularly noteworthy that Wright had no white teachers in the 1967–68 school year, but employed *four* for the 1968–69 school year.

## NELLA WILLIAMS AND DORIS COCKERHAM

Both Williams and Cockerham were hired by Board in January of 1966 to teach at Wright, where they remained during their entire employment. Williams had graduated from Southern University in 1963, and had been certified by the education department of Louisiana to teach elementary grades in the same year. Before coming to the defendant school system, she had taught elementary grades in Jackson Parish, Louisiana.

At no time were the teaching performances of Williams or Cockerham ever questioned by any one connected with Wright or Board.

April 30, 1968, Jackson, Principal of Wright, at different times called Williams to his office; and then Cockerham. It is undisputed that he then told them that integration of Wright had made necessary the replacement of each of them by white teachers. Thereafter Williams and Cockerham received identical letters from M. A. Phillips, Superintendent of Board, dated May 7, 1968, which read:

"We are required to place some white teachers in all of our former negro schools for the 1968–69 school year.

"It is unfortunate that one of them will have to take your place. In the event there are later openings that you may be able to fill we will let you know.

"If I can assist you in seeking employment elsewhere, you have permission to use me as a reference."

Shortly after receiving these letters, Williams and Cockerham, along with Martin, went to see Phillips about their dismissals. They explained that they were "elementary teachers, and not just Negro teachers," and thus would be willing to accept positions in a white school. Phillips again confirmed that Williams and Cockerham had been replaced by white teachers. He further advised that it was against Board's policy to transfer replaced teachers.

Shortly after the teachers left, an aide of Phillips, who had overheard the

---

1. Both Tallulah Elementary and Tallulah High had two Negro teachers in the 1967–68 school year and two in the 1968–69 school year.

discussion, advised Phillips that his actions with reference to the replaced teachers were in violation of our April 7, 1967, order. Phillips, by his own testimony, conceded this mistake and thus sought to "remedy" it with the following action.

May 15, 1968, and May 24, 1968, he sent Cockerham and Williams, respectively, letters notifying them that they had been assigned to Anderson Island School. This—not unlike a consignment to Siberia—is a one-room school located on a plantation approximately 60 miles from Tallulah, Louisiana. All of its twenty-three students are Negroes. At time of hearing they ranged from grades 1 through 8. The one teacher there was and is expected to teach all grades. The School was built and paid for by the plantation owner, who, instead of Board, maintains the building and surrounding grounds. While there is a room connected with the school where a teacher could live, there are no suitable living accommodations for a teacher with a family, or for two teachers. According to Williams, who visited the school after being informed of her "assignment" there, the building was "not in the best condition," and was closed at the time because of high grass surrounding it.

In effect, Williams and Cockerham were given the "choice" of taking the Anderson Island position or being dismissed from Board's system. Each chose the latter.

## HOSEA ATKINS

Atkins was teaching the fourth grade at Wright at the time of his dismissal.[2] On or about April 19, 1968, he received from Phillips a letter addressed to him. Attached to it was a copy of a letter from Phillips to Board. The letter to Atkins read:

"Dear Mr. Atkins:

"Enclosed herewith is a copy of the letter I am submitting to the Madison Parish School Board at its next meeting."

Phillips's letter to Board read:

"Dear School Board Members:

"It is my recommendation that Mr. Hosea Atkins not be re-employed as a teacher in the Madison Parish Schools for 1968–69 as his work has not been satisfactory."

———◆———

At the hearing, Phillips testified that the sole reason for Atkins's dismissal *in April of 1968* was his unsatisfactory conduct on a Field trip in the *spring of 1967*. According to Phillips, when the trip was made, the fourth grade at Wright had just completed a study of Holland. The Field trip was to Dutch Gardens, a public park in Louisiana, built in the likeness of the geography and culture of Holland, and therefore was deemed appropriate.

Atkins was among seven or eight teachers who accompanied the pupils and were responsible for their supervision and behavior. At Dutch Gardens, the children became quite unruly, destroying some of the property. This incident was embarrassing to Board, particularly since it happened while five dignitaries from foreign countries were visiting the park. Phillips testified that he learned from others that Atkins had told people connected with management of Dutch Gardens that he was not responsible for such pupil misbehavior. Since Phillips felt that all teachers shared responsibility for the incident, he was displeased

2. Atkins did not appear at the hearing and there is no other evidence in the record as to when Atkins was hired or what his prior teaching experience might have been.

with Atkins's disavowal. Phillips said he "felt obliged" to keep Atkins through the following school year, but when the matter of Atkins's employment came up in the spring of 1968, he felt that this incident provided sufficient basis for recommending that Atkins not be employed the following year.

From testimony at the hearing, it is clear that Phillips did not know whether any of the misbehaving pupils were from Atkins's class, nor did he know whether Atkins was in any way actually negligent in the performance of his duties at Dutch Gardens. Moreover, Phillips had called into his office all teachers involved, shortly after the incident, and at a time when he had been informed of Atkins's denial of responsibility. At this meeting Phillips did not mention to Atkins his particular dissatisfaction with Atkins's conduct, nor, for that matter, has he ever, before or after the dismissal, informed Atkins that his conduct there was unsatisfactory.

Since Atkins did not appear at the hearing, Phillips's testimony was the only evidence presented with reference to this dismissal. It is also noted that the record is totally void of any other evidence of allegedly unsatisfactory professional performance by Atkins.

### FLORA MARTIN

Martin began teaching at Wright in January of 1966. At that time she did not have a Teacher's Certificate, because, while she had finished her courses at Grambling College, she had failed to make the required score on the National Teacher's Examination. Later, however, she passed that test, and September 30, 1966, she received her final diploma from Grambling.

According to Martin, Jackson together with Frances Robinson, elementary supervisor at Wright, visited her classroom on several occasions during her employment there.[3] These visits normally lasted about twenty minutes. Robinson never mentioned to Martin how her performance was rated. Jackson, however, did discuss the matter with her. Martin testified that Jackson always offered suggestions for improvement, but never told her that her performance was unsatisfactory.

Martin said that in March of 1968, her classroom was visited by Ernestine Kinchen, a reading specialist; that Kinchen administered a reading test to the class; that Kinchen told her the results of this test were good; and that Kinchen made no mention of her teaching performance, one way or another.

About April 19, 1968, she received from Phillips a letter addressed to her, along with a copy of a letter from Phillips to Board, both of which were exactly like those sent to Atkins.

Soon after receiving this letter, Martin visited with Jackson. Her testimony about that visit was as follows:

"I told him [Jackson], I says, 'I got a letter and I would like for you to tell me what is going on around here because I don't know.'

"He said, 'What kind of letter did you get?'

"So, I told him.

"He said, 'What did it say?'

"And I said it was a letter saying I will not be re-employed for the 1968–69 school session and I would like to know why.

"He said, 'Mrs. Martin, I don't know what was in the letter but I do know it was being in the process of being sent to you but how it was worded, I don't know.' He said, 'You are not being fired from me, but you were hired at the time under the Federal plan.' And he said, 'Due to the changes that we had to integrate the schools and, therefore, we had to get white teachers to bring in to fill your position.'

"He said, 'You were one of the victims that had to be dismissed.'

---

3. Martin testified that to the best of her recollection, three such visits were made during her employment at Wright.

"He said, 'But you are not being fired.'

"He said, *I will recommend you anywhere you need to go to get another job.'* " (Emphasis added.)

Martin, along with Williams and Cockerham, then proceeded to Phillips's office to discuss the matter further. After listening to Williams and Cockerham discuss their dismissals with Phillips, Martin inquired as to the reason for her dismissal. According to Martin, Phillips replied:

"He said, 'I have people going over there to see what is going on and we just didn't want you anyway.' "

Phillips testified that his recommendation that Martin be dismissed was based solely on Jackson's recommendation. Although Jackson did not testify at the hearing before this Court, his oral deposition was taken subsequently and was made part of the record. That deposition constitutes the sole source of evidence as to the allegedly specific reasons for Martin's dismissal.

In his deposition, Jackson discussed at great length the Martin dismissal. He said that she had taught the first, second, and third grades at Wright; that in the spring of 1967, at the completion of Martin's first full year, Jackson believed that her teaching performance was not satisfactory but that he recommended her retention because he believed that "she was bogged down in family problems, and that she would snap out of this and come around"; that as a result of his recommendation, Martin was employed for the 1967–68 school year; that in his opinion, based solely upon his own observation, Martin did not improve during the 1967–68 school year; that he discussed the mat-ter of her progress with her supervisor, Robinson, and they agreed a reading specialist should be assigned to assist her; that the reading specialist, Kinchen, was assigned to help; that Kinchen reported to Jackson that Martin was "unco-operative"; that as the end of the 1967–68 school year neared, since Martin had failed to improve, Jackson recommended to Phillips that she not be re-employed. At several points in his deposition, Jackson emphasized that this recommendation was based strictly upon Martin's teaching performance, and had nothing whatever to do with faculty integration of Wright. He also categorically denied ever telling Martin that she was being dismissed because of faculty integration; rather he said he gave as the reason her unsatisfactory teaching performance.

## DISCUSSION OF THE CONSTITUTIONAL ISSUES

■ We recognize that a school board should and does have wide latitude, much discretion, in employment and dismissals of its faculty members. Beilan v. Board of Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958). We also are aware of the awesome burdens which fall upon a board when its schools are ordered to desegregate. Thus we are loath to interfere and override the actions of that public body in the exercise of its broad discretionary powers and functions. Rackley v. School District No. 5, Orangeburg County, S. C., 258 F.Supp. 676, 684 (S.C.1966).

We may not overlook, however, the many recent cases illustrating the equal protection and due process rights of teachers who seem to fall victims of faculty desegregation.[4] Nor can we over-

4. Walton v. Nashville, Arkansas, Special Sch. Dist. No. 1, 401 F.2d 137 (8 Cir. 1968); North Carolina Teachers Association v. Asheboro City Bd. of Ed., 393 F.2d 736 (4 Cir. 1968); Rolfe v. County Bd. of Ed. of Lincoln County, Tenn., 282 F.Supp. 192 (E.D.Tenn.1966), aff'd 391 F.2d 77 (6 Cir. 1968); Wall v. Stanly County Bd. of Ed., 378 F.2d 275 (4 Cir. 1967); Smith v. Bd. of Ed. of Morrilton Sch. Dist. No. 32, 365 F.2d 770 (8 Cir. 1966); Chambers v. Hendersonville City Bd. of Ed., 364 F.2d 189 (4 Cir. 1966); Johnson v. Branch, 364 F.2d 177 (4 Cir. 1966); Teel v. Pitt County Bd. of Ed., 272 F.Supp. 703 (E.D.N.C.1967).

look the clear letter and spirit of our April 7, 1967, model *Jefferson* decree, which the Fifth Circuit required us to enter and is itself based on the equal protection and due process clauses of the Fourteenth Amendment.

We find that the cases cited in the margin (fn. 4), when considered in light of *Jefferson*, established that these clauses of the Fourteenth Amendment require that the following rules be applied when a teacher is displaced as a result of faculty desegregation.[5]

■■ The qualifications of *all* teachers in the system must be evaluated by *objective* standards, resulting in dismissal only of the least qualified. The fact that a teacher has not acquired tenure status under State law properly may be a factor in this comparison. Parker v. Board of Education of Prince George's County, Md., 237 F.Supp. 222 (Md.1965), aff'd 348 F.2d 464 (4 Cir. 1965). This, however, may not be used as the only basis upon which to discriminate against teachers serving on a faculty which is being desegregated. School boards in States having tenure legislation should:

> "* * * establish definite objective standards for the employment and retention of teachers and to apply such standards to all tenure teachers, on the one hand, and non-tenure teachers, on the other, consistently with the due process and equal protection clauses of the Constitution of the United States."[5a]

Thus we first must determine whether the intervenor teachers here were dismissed *as a result of faculty desegregation.* If they were, then the constitutional standards set forth must have been met. With regard to whether the dis-

missals were the result of such faculty desegregation, we must accept the current jurisprudence found in North Carolina Teachers Association v. Asheboro City Board of Education, 393 F.2d 736 (4 Cir. 1968); Rolfe v. County Board of Education of Lincoln County, Tenn., 282 F.Supp. 192 (E.D.Tenn.1966), aff'd 391 F.2d 77 (6 Cir. 1968); Chambers v. Hendersonville City Board of Education, 364 F.2d 189 (4 Cir. 1966); Wall v. Stanly County Board of Education, 378 F.2d 275 (4 Cir. 1967).

■ Which is to say that a long history of racial discrimination, coupled with disproportionate discharges in the ranks of Negro teachers where desegregation finally is begun, gives rise to a rather strong inference of discrimination in failure to re-employ Negro teachers in other schools. Such circumstances cast the burden of proof on school boards to show that failure to rehire was for non-discriminatory reasons, and require that such proof be clear and convincing, before failure to re-employ may be upheld.

■ Here we hold that Board failed to meet that burden with respect to any of the dismissals before us.

Clearly Williams's and Cockerham's dismissals were the result of faculty desegregation. Phillips admitted that he so informed the teachers that this was so, by letter and in person. His rather clumsy attempts to "remedy" such discriminatory dismissals by giving these teachers a choice of Anderson Island or dismissal amounted to nothing less than a "Hobson's choice," so transparent that we must regard his "reasons" as transparently wrong.

The "facts" asserted by Phillips for his dismissal of Atkins were neither "clear"

---

5. Displacement can result not only when teachers of different races are exchanged on a one-for-one basis. It often is the case that school consolidation, such as by freedom of choice plans, make possible a reduction and a savings in the over-all teaching staff. See, e. g., Walton v. Nashville, Ark., Special Sch. Dist. No. 1, 401 F.2d 137, 142 (8 Cir. 1968); Smith

v. Bd. of Ed. of Morrilton School Dist. No. 32, 365 F.2d 770, 774–775 (8 Cir. 1966).

5a. Rolfe v. County Bd. of Ed. of Lincoln Co., Tenn., 282 F.Supp. 192, 200 (E.D. Tenn.1966) aff'd 391 F.2d 77 (6th Cir. 1968).

nor "convincing." We cannot concede that any school administrator would dismiss a teacher, who apparently was completely satisfactory otherwise, for such a flimsy reason as the Dutch Gardens incident. By his own testimony, Phillips had no substantial basis on which to conclude that Atkins did not normally exercise required supervision of students, such as at Dutch Gardens. He said he did not recall whether Atkins's pupils misbehaved. Moreover, even if that incident could provide a substantial basis for dismissal, why did not Phillips dismiss Atkins after the incident, a year earlier, in the *spring of 1967*? Instead, he waited until *April of 1968*. And if this incident so raised Phillips's ire, we must inquire, reasonably, as to why did he at no time advise Atkins of his alleged failure.

The most difficult case here is that of Martin. In his deposition, Jackson advanced reasons, unrelated to faculty desegregation, for Martin's dismissal. In conflict with practically everything therein, however, was Martin's testimony. To resolve these conflicts, we would have welcomed the testimony of Frances Robinson, Martin's supervisor, or Ernestine Kinchen, the reading specialist; but neither of them was presented as a witness for Board, nor were their depositions taken. On this record, their professional views are totally missing.

In this regard, we cannot overlook that Wright was, at the time of the dismissals, suffering from over-staffing, a problem frequently arising when school consolidations occur; [6] nor can we ignore that *four* white teachers were assigned to Wright for the 1968–69 school year, precisely the same number of dismissals which occurred in that school at the close of the 1967–68 school year, without the Negro teachers being given opportunity for assignments or transfers to formerly all-white schools.

Considering the entirety of these factors, we must hold that Board did not meet its burden of proof with respect to Martin.

■ It is undisputed that Board did not attempt to meet the standards of *objective* comparison required in cases of dismissal as the result of faculty desegregation. It apparently compared the four teachers only with other teachers at Wright, rather than with *all teachers in the system*. Thus we are bound to hold that their equal protection and due process rights, guaranteed by the Fourteenth Amendment, were violated.

At the beginning of the next school year, all four of these teachers must be given the first opportunity for *any* open teaching positions in Board's system for which they qualify, and thus are not to be considered merely on a par with prospective new applicants. If there are no openings, they must be objectively compared with *all* other teachers now in the system. If they are found to be superior to any, then they must be given such positions and the least qualified dismissed. If not, then they quite rightly may be refused acceptance in the school system.

■ Wrongful dismissal of teachers also entitles them to recover provable damages. Wall v. Stanly County Board of Education, 378 F.2d 275 (4 Cir. 1967); Smith v. Board of Education, 365 F.2d 770 (8 Cir. 1966); Chambers v. Hendersonville City Board of Education, 364 F.2d 189 (4 Cir. 1966); Johnson v. Branch, 364 F.2d 177 (4 Cir. 1966); Rolfe v. County Board of Education, 282 F.Supp. 192 (E.D.Tenn.1966), aff'd 391 F.2d 77 (6 Cir. 1968). The record shows that Martin, Williams and Cockerham found teaching employment elsewhere for the school year 1968–69. A proper damage element for them could include salary differences, if any, through the 1968–69 school year, plus actual moving expenses to their new positions. If they are re-employed in Board's system for the next school year, they also should be awarded reasonable

---

6. See note 5, supra.

expenses of moving back to Madison Parish.

■ We must and do reject plaintiff-intervenors' claims for attorneys' fees. Such fees are rarely granted where neither statute nor contract calls for them. Maier Brewing Co. v. Fleischmann Distilling Corp., 359 F.2d 156 (9th Cir., 1966), aff'd 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475; Kemp v. Beasley, 352 F.2d 14 (8 Cir. 1965). While the dismissals here obviously were wrong, as we have outlined, we cannot say that they were so "unreasonable [and] obdurately obstinat[e]" [7] as to warrant an award for attorneys' fees.

A further factual hearing may be necessitated to establish the quantum of damages, if any.

Intervenor-plaintiffs should present a proper decree.

See also D.C., 295 F.Supp. 590.

---

**7.** Bradley v. School Board of the City of Richmond, 345 F.2d 310, 321 (4 Cir. 1965). See also Rolfe v. County Board of Education of Lincoln County, Tenn., 282 F.Supp. 192 (E.D.Tenn.1966), aff'd 391 F.2d 77 (6 Cir. 1966); Bell v. School Board of Powhatan County, Va., 321 F.2d 494 (4 Cir. 1963).