364 F.2d 177
 Willa JOHNSON, individually and as a representative of a class composed of herself and other Negro school teachers of Halifax County, North Carolina, similarly situated, and as a representative of a class composed of herself and other Negro citizens of Halifax County, North Carolina, similarly situated, Appellant,
v.
Joseph BRANCH, individually and as attorney for the Board of Education of Halifax County, North Carolina, et al., Appellees.
 No. 10281.
 United States Court of Appeals Fourth Circuit.
 Argued April 7, 1966.
 Decided June 6, 1966.
 
 William M. Kunstler, New York City, and Philip J. Hirschkop, Alexandria, Va. (Kunstler, Kunstler & Kinoy, New York City, Lainof, Cohen & Cohen, Alexandria, Va., Samuel S. Mitchell, Raleigh, N. C., and Prof. Chester J. Antieau, Washington, D. C., on brief), for appellant.
 Richard B. Allsbrook, Roanoke Rapids, N. C. (Julian R. Allsbrook and Allsbrook, Benton, Knott, Allsbrook & Cranford, Roanoke Rapids, N. C., on brief), for appellees.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges.
 J. SPENCER BELL, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the district court dismissing with prejudice the plaintiff's complaint seeking reversal of the action of her school committee which refused to renew her contract of employment as a teacher. She contends that the committee acted either in an arbitrary and capricious manner or acted to penalize her for exercising her constitutional rights. Jurisdiction is based upon Title 28 U.S.C. § 1343(3), Title 42 U.S.C. §§ 1971, 1981, 1983 and 1985, and the First, Fifth, Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution of the United States.
 
 
 2
 The record discloses, the defendants concede, and the court found that the plaintiff, a Negro, was a well qualified, conscientious, and competent teacher of English at the T. S. Inborden High School in the town of Enfield, North Carolina, for a period of nearly twelve years preceding the incidents involved here. In addition to her teaching duties she had done a great deal of "extracurricular" work for the school and for student activities which indicated her devotion to her professional task. During the year 1962-1963 the Principal graded her in all fields as excellent and above average, the two highest possible ratings used in the system of grading teachers by the Halifax school system. Her superintendent, a defendant, testified that she had been an above average teacher and was doing very satisfactory work.
 
 
 3
 Beginning in the month of April 1963, the town of Enfield became a focal point of civil rights activity which included a voter registration drive, the candidacy of a number of Negroes for public offices, a major federal voting suit, an attempt to use the public library by Negro high school students, and the picketing of places of public accommodation. The local theatre closed, and mass convictions for picketing at a local restaurant were finally reversed by the Supreme Court. Blow v. North Carolina, 379 U.S. 684, 85 S.Ct. 635, 13 L.Ed.2d 603 (1965). The plaintiff was a participant in one of the demonstrations and in the voter registration and voting activity. Both her husband and her father were candidates for public office. Her uncle brought suit in the federal district court in an effort to secure the Negroes an adequate opportunity to register.
 
 
 4
 The civil rights movement in Enfield became increasingly active and controversial during the summer and fall of 1963 and continued into the winter of 1964. It had not terminated at the time that teaching contracts came up for renewal at the April 23, 1964, meeting of the District School Committee. In March, Mrs. Johnson received from her Principal, L. M. Williams, a letter dated March 10, 1964, listing seven infractions of the school rules which he asked her to correct. The plaintiff offered expert evidence to show, and the district court in its comments appeared to agree, that these infractions individually and collectively were not in themselves justification for failure to re-employ the plaintiff. None of them involved the quality of her classroom work. Instead they covered such matters as being 15 minutes late to supervise an evening athletic contest; arriving at the school building a few minutes after the prescribed sign-in time but before any class was due to commence; failure to furnish a written explanation for not attending a P.T.A. meeting; failure to stand in the door of her classroom to supervise pupils as the classes changed, and failure to see that the cabinets in her home room were clean and free of fire hazard. To all of these, the plaintiff offered explanations, and early in April the plaintiff received a letter dated March 31, 1964, in which the Principal informed her that he had seen improvement "in the areas mentioned" in the letter of March 10th. The letter continued "I am recommending you for re-election for a teacher for the 1964-1965 school term on condition that you continue to show improvement. * * *" Prior to the meeting of the District School Board in April, Principal Williams did in fact sign the plaintiff's contract, thus complying with the state's legal requirement that he recommend her before the Committee could act on her contract. The record discloses that the former pleasant relationship between Mrs. Johnson and the Principal, Williams, became strained over the period of her civil rights activities. The plaintiff contends that Williams was opposed to such activity on the part of school teachers and exhibited his hostility by criticizing her. She concedes that she took offense at his actions. However, she insisted that at no time were their relations such that they interfered with her official duties, and Williams also conceded that he could not specify a single infringement of the rules after the warning of March 10th. In any event, his testimony confirmed his statement of March 31st that she had improved and that he had recommended extending her contract for another year.
 
 
 5
 The District Committee met on April 23, 1964, to consider renewal of teacher contracts. In attendance were County Superintendent Overman, Principal Williams, Committee Chairman Coppage, and members Throne, Copeland, Mrs. Arnold and Mrs. Morisette. All the members of the school committee knew of the civil rights activity in general and of the participation of Mr. Johnson, the plaintiffs husband, therein, though they denied specific knowledge of the plaintiff's part or of her relationship as wife to the Mr. Johnson who was running for the State Senate from that district. At this meeting all the committee members (except the Chairman, Coppage, who had received copies) first became aware of the two letters to Mrs. Johnson. In their testimony before the court they all declared that their decision was based solely on the letters. Superintendent Overman testified that at the meeting Williams renewed his favorable recommendation of March 31st. None of the members was able to testify to any inquiry into further details made at the meeting. All action on teacher contracts was postponed until a meeting on May 27, 1964. During the interval no further investigation was made by any member of the committee of Mrs. Johnson's conduct. The meeting on May 27th was attended by the Chairman and three members of the committee. Present also was a member of the County School Board who had previously told Mrs. Johnson's husband that a teacher would be fired for voting activity. The members voted 2 to 1 against renewing Mrs. Johnson's contract. There was no discussion of her conduct. The two members who voted against renewal conceded frankly that they were opposed to integration of the schools. On June 2nd, the Principal told Mrs. Johnson that her contract had not been renewed because of insubordination to him. The district court, after reviewing the record, found that "* * * there was good cause for not re-employing the plaintiff under the circumstances as established by the evidence" because of the "plaintiff's inability to perform those extracurricular duties required of her promptly and in a cooperative manner. * * *" We hold that the court committed clear error in this finding, but before discussing the facts we turn to the law of the case.
 
 
 6
 The law of North Carolina is clear on the procedure for hiring teachers. All contracts are for one year only, renewable at the discretion of the school authorities. A contract must be signed by the Principal as an indication of his recommendation and then transmitted to the District School Committee, whose business it is either to approve or disapprove in their discretion. (N.C.G.S. § 115-72). There is no vested right to public employment. No one questions the fact that the plaintiff had neither a contract nor a constitutional right to have her contract renewed, but these questions are not involved in this case. It is the plaintiff's contention that her contract was not renewed for reasons which were either capricious and arbitrary or in order to retaliate against her for exercising her constitutional right to protest racial discrimination.
 
 
 7
 The Supreme Court has recently had occasion to consider the law in this and analogous areas. It has pointed out on numerous occasions the importance of the teaching profession in our democratic society and the necessity of protecting its personal, associational and academic liberty. "Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always be free to inquire, to study and to evaluate * * *." Sweezy v. State of New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957); Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952).
 
 
 8
 In Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), the Court struck down an Arkansas statute which required teachers to list every organization to which they belonged or contributed as violative of the due process clause of the Fourteenth Amendment. In that case, as here, the School Board had refused to renew a teacher's contract at the end of the school year. The Court said:
 
 
 9
 "Such interference with personal freedom is conspicuously accented when the teacher serves at the absolute will of those to whom disclosure must be made — those who any year can terminate the teacher's employment without bringing charges, without notice, without a hearing, without affording an opportunity to explain. * * * Public exposure, bringing with it the possibility of public pressure upon school boards to discharge teachers who belong to unpopular or minority organizations, would simply operate to widen and aggravate the impairment of conditional liberty." (364 U.S. at 486-487, 81 S.Ct. at 251.)
 
 
 10
 We take it to be beyond cavil that the state may not force the plaintiff to choose between exercising her legitimate constitutional rights and her right of equality of opportunity to hold public employment. In Alston v. School Board of City of Norfolk, 112 F.2d 992 (4 Cir., 1940), cert. denied, 311 U.S. 693, 61 S.Ct. 75, 85 L.Ed. 448 (1940), this court struck down a practice of paying lesser salaries to Negro school teachers. In that case Chief Judge Parker said:
 
 
 11
 "It is no answer to this to say that hiring of any teacher is a matter resting in the discretion of the school authorities. Plaintiffs, as teachers qualified and subject to employment by the state, are entitled to apply for the positions and to have the discretion of the authorities exercised lawfully and without unconstitutional discrimination as to the rate of pay to be awarded them, if their applications are accepted.
 
 
 12
 * * * * * *
 
 
 13
 "* * * If a state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties imbedded in the Constitution of the United States may thus be manipulated out of existence." [Citing and quoting Frost Trucking Co. v. Railroad Comm., 271 U.S. 583, 594, 46 S.Ct. 605, 70 L. Ed. 1101 (1926)] (112 F.2d at 996-997).
 
 
 14
 Again in Franklin v. County School Board of Giles County, 360 F.2d 325 (4 Cir. 1966), this court ordered that Negro teachers whose contracts were not renewed because of their race be reinstated. There the Board contended that they had, in the act of failure to renew the contracts, compared the qualifications of the teachers with others in the system and found them inferior, but the record disclosed no objective evidence of such inferiority in the face of equal certification and experience. However wide the discretion of School Boards, it cannot be exercised so as to arbitrarily deprive persons of their constitutional rights. Zimmerman v. Board of Education, 38 N. J. 65, 183 A.2d 25, 27-28 (1962); Garner v. Board of Public Works, 341 U.S. 716, 725, 71 S.Ct. 909, 95 L.Ed. 1317 (1951). The principle has often been applied in analogous situations. Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). In Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957), the Court said:
 
 
 15
 "We recognize the importance of leaving the States free to select their own bars, but it is equally important that the State not exercise this power in an arbitrary or discriminatory manner nor in such [a] way as to impinge on the freedom of political expression or association." (At 273, 77 S.Ct. at 733.)
 
 
 16
 This principle has been upheld by the Supreme Court of North Carolina in cases involving school teachers. Cf. Cody v. Barrett, 200 N.C. 43, 156 S.E. 146 (1930); Harris v. Board of Education of Vance County, 216 N.C. 147, 4 S.E.2d 328 (1939). Having explicated the principles of law involved, we now turn to the facts.
 
 
 17
 While there is some ambiguity in the court's findings and conclusions, we think it a fair summary to say that the court found that the plaintiff's civil rights activities consumed so much of her time and interest that they interfered with her "extracurricular" activities at the school; created some dissension between her and the Principal, and caused the Board's refusal to renew her contract. This independent finding of the court is irrelevant because it is not the reason advanced by the Board members for refusing to execute her contract. The statute gives discretion to the school board in deciding whether or not to continue the employment of a teacher. Discretion means the exercise of judgment, not bias or capriciousness. Thus it must be based upon fact and supported by reasoned analysis. In testing the decision of the school board the district court must consider only the facts and logic relied upon by the board itself. It is "a simple but fundamental rule of administrative law * * * that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside for the administrative agency." S. E. C. v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Similarly the district court may not usurp the discretionary power of the school board but must judge the constitutionality of its action on the basis of the facts which were before the Board and on its logic. The testimony of all the members of the Board was that they did not know of the plaintiff's civil rights activities, or at least the extent thereof, and that their action was based solely upon the letters of March 10th and March 31st. We accept the defendant's statements that they were not aware of the extent of the plaintiff's personal participation in this activity because the district court credited them. Thus the record offers no objectively substantiated facts known to the Board with regard to the plaintiff's civil rights activity which would justify the Board's action as found by the court. Additionally the finding of the district court as to cause for cessation of employment is clearly in error because it is not supported by the record.
 
 
 18
 That the plaintiff had her disagreements with her Principal is obvious from the record. In such periods of great emotional stress there is no more reason to expect the Negro community to be unanimous than to expect the white to be so. But that these disagreements had been satisfactorily settled by March 31st in such a manner as not to interfere with her school work was shown both by the Principal's letter of that date and by his testimony. He testified that the plaintiff had improved in her attitude toward him and that she had not violated any of the rules since the warning of March 10th. Furthermore, the members of the Board testified that they had not further questioned the Principal and that they acted solely on the strength of the letters and their personal opinions that the Principal did not want the plaintiff's contract renewed. Thus there is no support in the record for the court's finding that the extent of the plaintiff's activities interfered with her school work or that the Principal and the plaintiff had not reached a satisfactory understanding of their differences. We take it to be self-evident that the objections held either by the Board or the Principal to the plaintiff's exercise of her personal and associational liberty to express her feelings about segregation would not justify refusal to renew her contract so long as these activities did not interfere with her performance of her school work. We feel that the infractions enumerated in the March 10th letter were neither individually nor collectively such as to justify failure to renew the contract of a teacher with the plaintiff's record of twelve years. The district court did not seek to rely on these infractions to support the dismissal. These being the only basis for the school board's decision, we find that the action of the school board was arbitrary and capricious.
 
 
 19
 We, with the district court, accept the defendants' statements that they did not know of the extent of the plaintiff's activities for civil rights but they knew of her attitude towards the civil rights movement. She made no secret of it. The Principal forced her to cancel an invitation to a local civil rights leader to talk to the students in her lecture course, even though he was not to talk about civil rights (she acceded to this order). Mr. Copeland, the member who moved not to renew her contract, was a member of the Town Council which rejected an equal accommodations ordinance strenuously backed by both Mrs. Johnson and her husband several weeks before the April meeting. Three days before the meeting, Mr. Coppage pointed out the plaintiff's husband to his fellow board member Thorne at the polling place.
 
 
 20
 In this factual context we think the court committed error in separately weighing the facts with respect to the plaintiff's two contentions: first, that the Board either acted arbitrarily or capriciously, or second, that it acted to penalize her for her civil rights activity. In weighing the reasons offered by the Board to support its contention that it did not act arbitrarily, we cannot ignore the highly charged emotional background of a small eastern North Carolina community in the throes of a civil rights campaign where more than 51% of the population was Negro and where the two members of the Board who voted against the plaintiff confessed to knowledge of her husband's activity and their opposition to school desegregation. To accept such an analysis we would have to pretend not to know as judges what we know as men. It is apparent on this record that absent the racial question, the issue would not have arisen. The only reasonable inference which may be drawn from the failure to renew Mrs. Johnson's contract in the face of her splendid record of twelve years on such trivial charges was the Board members' objections to her racial activity. We cannot weigh the separate contentions in airtight compartments.
 
 
 21
 For these reasons the order of the district court is reversed and the case remanded with instructions to enter an order directing the Board to renew her contract for the next school year (1966-1967) and to determine her damages.
 
 
 22
 Reversed and remanded.
 
 ALBERT V. BRYAN, Circuit Judge (dissenting):
 
 23
 I would affirm. The primary infirmity of the majority opinion is its determinative premise: that the District Court was limited to a consideration of only those facts or reasons which the School Committee stated were the basis for its administrative determination not to renew appellant-plaintiff's contract — that the Court could make no other findings of facts, or give any other reasons for its decision upholding the Committee's action, even on definitive proof of the existence of such other facts and reasons. I would affirm because the findings of the District Court, rightfully made, securely support its conclusion that the Committee's action was warranted and not race-inspired.
 
 
 24
 I. This suit cannot be equated, as the majority does, with a statutory review of a decision of an administrative body. That was the frame of the case, S. E. C. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), now cited by the majority as precedent for its postulate that the trial court was confined to the facts and reasons which the Committee relied on for its decision. But this rule does not obtain in a general equity suit such as the present action. This is an original suit seeking to redress deprivation of civil rights. Even in the predicate statute it is designated as a "suit in equity".[1] The variety of relief prayed also manifests its character as a common chancery cause. It seeks: (1) an injunction against interference with the plaintiff and her class in the exercise of their rights; (2) a mandatory injunction requiring defendants to renew plaintiff's contract; (3) recovery of damages, special and exemplary; and (4) the award of counsel fees.
 
 
 25
 While the complaint pleaded an attack upon a State administrative decision, it was not an "appeal" from it. Indeed, to repeat, the complaint does not purport to be confined to a "review" of the decision. In these circumstances, Burford v. Sun Oil Co., 319 U.S. 315, 317, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) explained that such a case is "a simple proceeding in equity". See, too, Chicago, R. I. & P. R. Co. v. Stude, 346 U.S. 574, 581, 74 S.Ct. 290, 98 L.Ed. 317 (1954).
 
 
 26
 To decree the asserted liabilities against the defendants without reference to all the facts and circumstances is, for me, not only an astounding but an alarming denial of due process. It must be remembered that in making its decision the Committee was not required to, and did not, give any facts or grounds for its determination. The majority rejects the reasons stated by the District Judge for his decision "because it is not the reason advanced by the Board members for refusing to execute her contract". "In testing the decision of the school board", we are told, "the district court must consider only the facts and logic relied upon by the board itself". Obviously, the opinion is referring to the reasons, facts and logic which the Committeemen said at the trial were the foundation of their determination. Consequently, the holding of the opinion amounts to this: even if there were in truth other reasons, facts and logic which justified the defendants' decision, but at trial the school authorities did not specify them as grounds relied on at the time of their decision, the District Court could not now look to them to see if the defendants' action was on the whole right, and whether they should be subjected to the other prayers of the complaint.
 
 
 27
 This is strange doctrine. If one performing legislative or administrative duties states in a suit against him that he acted only on certain facts or logic, which later appear to be wrong, inadequate or unsound, but in actuality a sound basis for his action appears in the evidence, I have never understood that he could not defend on that ground. This is so whether the additional facts were unknown or known but not recalled by him. Indeed, the other circumstances might even render moot the question whether the defendant was justified in acting on the facts and logic which he did employ. If his decision is ultimately proved right and just, error in reaching it does not fault the decision.
 
 
 28
 I have never known a defendant to be so straitjacketed in his defense, or while so bound to be cast in damages, as by the decree the majority now issues. I think it legally impermissible.
 
 
 29
 II. From all the evidence before him, which I think the District Judge was free to consider, and from all his findings and conclusions, which I think he was by law free to make, it clearly appears that this is not a color case. The judge carefully and candidly explored this accusation. The facts discovered expose its baselessness and the plaintiff's neglect of her duties as the real ground for the School Committee's refusal to renew the appellant-plaintiff's contract. If the burden is on the defendants, they have fully acquitted themselves of race motivation. The insinuation of race into the decision is unfortunate and unwarranted.
 
 
 30
 I cannot agree with the majority's conclusion that the District Judge thought, or that it is true, that the offenses enumerated in the principal's letter of March 10, 1964 neither individually nor collectively justified the Committee's resolution. To begin with, the complaints of the principal, himself a Negro, in this letter were not trivia or isolated instances. They were repeated derelictions in school rules. While regulations of this kind may seem miniscule to adult ex-students, they fill a definite need in the coordination of faculty responsibilities to both the school and the children. Disobedient teachers cannot be trusted to command obedience from the pupils. Furthermore, the principal's letter was not only a remonstrance in itself; it was also a reminder of previous admonitions. One of these — failure to report to work on time — had been the subject of a conference between the principal and plaintiff in January 1964. The District Judge found that the plaintiff's disregard of the principal's requirements "occurred with a greater frequency than indicated by this letter" and "there were indeed many clashes over violations".
 
 
 31
 The majority is mistaken in saying that "a fair summary" of the District Court's finding is "that the plaintiff's civil rights activities consumed so much of her time and interest that they interfered with her `extracurricular' activities at the school; created some dissension between her and her Principal, and caused the Board's refusal to renew her contract". Its inaccuracy will appear from the recital of the findings to follow. But if this summary is correct, it emphasizes the plaintiff's neglect. After-hours duties of a teacher are as important as those she is expected to fulfill during school time. Political participation did not excuse her, just as it would not justify other employees', absenteeism.
 
 
 32
 Neglect of her primary and curricular duties was explicitly specified by the District Judge:
 
 
 33
 "While plaintiff was attempting to use the school in this way [furtherance of the `negro voter registration drive'], principal Williams was noting a definite change in her personality and conduct. He noted violations of standards of teacher conduct which he testified were almost daily in frequency. He admonished her directly by conferences with her, and indirectly by calling various regulations and statements in the Teacher's Handbook to her attention.
 
 
 34
 "Plaintiff finally came to believe that every admonition given at a teachers' meeting was directly aimed at her alone. She then ceased to approach principal Williams on school projects, but would send one of her students to him in her stead.
 
 
 35
 "Defendant Williams, in turn, noted more violations and found that she tried to circumvent regulations rather than obey his instructions; she tended to quibble with him about their interpretation. This becomes especially apparent on the question of lateness at the opening of the school day.
 
 
 36
 "Plaintiff insisted that she did not have to be in her room at 8:00 A.M., but only at the `sign in' registry. Principal Williams felt otherwise and instructed plaintiff accordingly. A clash over this matter resulted.
 
 
 37
 "It further developed that plaintiff would make false entries on the `sign in' register in order to avoid the appearance of being at school later than 8:00 A.M." (Accent added.)
 
 
 38
 The majority opinion sees all of this nullified by the principal's letter of March 31, 1964 to the plaintiff. True, it noted her improvement since his letter of March 10, and stated his intention to recommend her reemployment for the 1964-65 school term "on condition that you continue to show improvement" and "providing that the District School Committee, Board of Education and the Superintendent approves of my recommendations". (Accent added.) In fact he did recommend her. But the Committee, aware of it all, declined to accept his recommendation.
 
 
 39
 This was its right — a discretion and determination entrusted to the Committee by the State of North Carolina. An administrative decision is not invalid because the court disagrees with it. Nor, as the majority opinion stresses, can a court, trial or appellate, substitute its discretion or judgment for the Committee's. The Committee's action stands until proved, on a balance of all the testimony, to rest on no evidence, on bias or on illegality. No illegality is suggested and abundant testimony underlies the District Court's findings of justification.
 
 
 40
 Because of the findings of fact rightfully and warrantably made by the District Court, I think the orders on appeal should be affirmed.
 
 
 
 Notes:
 
 
 [1]
 42 U.S.C. §§ 1983, 1985