Mrs. Mary B. HOLLIMAN, Plaintiff,

v.

Charles K. MARTIN, Jr., President, individually and in his official capacity as a representative of the administration of Radford College, and Leonard G. Muse, Rector of the Board of Visitors of Radford College in his official capacity as Rector of the Board of Visitors of Radford College, Defendants.

Civ. A. No. 70-C-56-R.

United States District Court,
W. D. Virginia,
Roanoke Division.

June 21, 1971.

William T. Winder, Christiansburg, Va., for plaintiff.

D. Patrick Lacy, Jr., Asst. Atty. Gen., Richmond, Va., for defendants.

## OPINION and JUDGMENT

DALTON, Chief Judge.

The present action comes to the attention of this Court by a complaint filed by the plaintiff, Mrs. Mary B. Holliman, seeking to compel the defendants, the Board of Visitors of Radford College and Charles K. Martin, its president, to reinstate plaintiff to her former teaching position and award damages for the allegedly illegal nonretention.

The present claim is predicated on Title 42 United States Code sections 1983 & 1985 in that the defendants, acting under color of a state statute, have allegedly deprived the plaintiff of rights guaranteed to her by the Constitution of the United States. More particularly, section 23–155.7 of the Code of Virginia authorizes the Board of Visitors to appoint all professors, teachers and agents and to fix their salaries. In this regard, as in all the affairs of the College, its president serves as the chief executive officer. It is in the exercise of this authority that the plaintiff alleges that the defendants have violated her constitutional rights by the arbitrary and capricious procedures employed and reasons given for her nonretention.

From the pleadings, depositions, affidavits, and general correspondence on file with this Court it appears that there is no genuine factual dispute as to the following material facts:

The defendant, Charles K. Martin, Jr. is presently the president of Radford College and its chief administrative officer entrusted with its government and control, subject to the paramount authority of the Board of Visitors of Radford College.

The plaintiff, Mrs. Mary B. Holliman, was initially employed by Radford College as an Instructor of English for the academic year 1965–1966. The American Association of University Professors' 1940 Statement of Principles on Academic Freedom and Tenure was made a part of the plaintiff's contract. The only other part of her original contract was a letter from the school, offering her employment and stating her starting salary. At the time of plaintiff's employment she held a Master's degree in English Literature. Following Mrs. Holliman's initial employment she was continuously in employment at Radford College for the next four years receiving one promotion from Instructor to Assistant Professor and receiving raises in pay totalling $3000.00. From March 1965 until February, 1969 she received each year a letter offering her continued employment and advising her that she was still operating under the 1940 Statement of Principles for Academic Freedom and Tenure.

On or about February 12 or 13, 1969 the plaintiff was requested to be in the office of the Vice President of Academic Affairs at Radford College, Dr. Daniel Marvin, by 10:30 A.M. At that time she was advised by Dr. Marvin and Dr. Silverman, Dean of the Department of Humanities, that the Dean's Committee on Tenure had voted, upon the recommendation of Dr. Silverman, to recommend to the Board of Visitors that the plaintiff not be granted tenure and not be reappointed for the academic year 1970–1971. There is some question as to what reasons were actually given the plaintiff for the Committee's adverse recommendation at this meeting. Also in question is whether or not the plain-

tiff was given an opportunity to resign in lieu of receiving her letter of nonre-appointment.

In a letter dated February 17, 1969 the plaintiff responded to some three reasons given for her dismissal and listed seven reasons why the previous decision was incorrect. In this letter she appealed to the Dean's Committee on Tenure to reconsider its decision. The Committee after consideration of the plaintiff's letter and without her personal appearance affirmed its earlier decision and the plaintiff was so notified orally by Dr. Marvin. The Board of Visitors affirmed the Committee's decision, and by letter dated February 12, 1969, but not mailed until later, the plaintiff received written notice that she would not be granted tenure and that she would not be reappointed for the 1970–1971 academic year. At no time has the plaintiff received written notice of the reasons underlying the Committee's decision nor has she had an opportunity to appear personally and offer evidence in her own behalf.

The plaintiff has since then appealed to Honorable Leonard G. Muse, Rector of the Board of Visitors to look into her nonreappointment and to Dr. Charles K. Martin, President, to re-evaluate the decision of the Dean's Committee on Tenure. Both men upheld the decisions made by the Dean's Committee on Tenure and the Board of Visitors not to re-appoint the plaintiff and Dr. Martin advised her that she should consider the decision final. Thereafter, the plaintiff submitted a list of charges against the administration of Radford College to the Faculty Committee on Academic Freedom and Tenure. This Faculty Committee has dismissed all but one charge due to the fact that it had no power to investigate and compel testimony regarding any of the charges made by Mrs. Holliman and that she couldn't otherwise substantiate any of her claims by documentary evidence. Therefore, the Committee was powerless to rectify any of Mrs. Holliman's charges unless the ad-ministraion would present voluntary admissions of guilt against itself.

Mrs. Holliman at this point after having exhausted all possible remedies within the academic community, filed suit in this court seeking relief based upon the facts as presented above.

The plaintiff contends that she has been the victim of arbitrary, malicious, and unfounded employment practices which violate her rights and privileges guaranteed by the Constitution of the United States.

She further alleges that the defendants' actions throughout the course of this case have been without legal cause and are designed to intimidate and deter the plaintiff and others in the acadamic community from exercising their rights under the laws and Constitution of the United States.

The plantiff also urges that she has a right to a full evidentiary adversary hearing concerning the reasons for her nonretention at Radford College. She claims that to be in accord with the "due process of law" guarantees of the Constitution that she must be afforded the right to confront her accusers and to put on evidence in her own defense at a hearing before the administrative body responsible for the decision on her continued employment.

The defendants on the other hand urge that their actions have been in complete conformity with the contractual agreement and the laws and Constitution of the United States. The defendant's position seems to be as follows:

The plaintiff had been awarded five consecutive contracts, each for a one year period. There has been no breach or threatened breach of such contracts on their part. The plaintiff was a mere probationary teacher throughout this five year period and although she had been reappointed for a number of years and received substantial increases in salary, she had no right to continued employment. The plaintiff as a probationary teacher was subject to the general

power of the Board of Visitors to appoint or remove at will. The defendants allege that the exercise of the Board's discretion is absolute and that a probationary teacher has no right to continued employment or to be apprised of the reasons for his nonretention. It follows that no statement of reasons need be given nor hearing offered. It is alleged that such complete discretion is essential to screen beginning teachers thoroughly before they acquire tenure, to the end that the tenured faculty may be kept at the highest possible level of competency, responsibility, and devotion to duty.

■ The question that is before the Court today is simply what is the nature and extent of the requirements of "due process of law" as applied in the present case of a nontenured college teacher. The resolution of such a question is not nearly so easy to articulate as the statement of the problem. In this case we have a true example of the adversary system in action. One side contends that the plaintiff has absolutely no rights at all under such circumstances, while the other side insists upon a formal trial type proceeding. It is quite clear that if the Constitution of the United States affords a professor no substantive due process—that is if the college can appoint, reappoint, dismiss and discontinue professors for any reason or no reason at all—then there is no reason to establish procedural safeguards for nonexistent rights. This Court thinks that the Constitution is clear in this regard. Certainly it is not constitutionally permissible to fail to renew the contract of a nontenured probationary professor solely on the basis of race, religion, political affiliation, or that he was exercising his otherwise protected rights of freedom of speech or association.

However, the case before the Court presents a much more difficult question as well as the obvious one. That question is whether it is constitutionally permissible for a state college to conduct its hiring practices in an arbitrary way. Can such a decision be made on a basis wholly unreasoned, or without factual support, or based upon rumor, surmise, or vindictiveness. In this regard the law at the present time is certainly conflicting and less than lucid.

The Supreme Court's latest and most illuminating case dealing with the meaning of due process in the employment area came in Cafeteria and Restaurant Workers Union Local 473 v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). In that case a cafeteria worker employed by a restaurant chain which served a government military installation was prevented from working on the government's property because she was denied a security clearance. The petitioner in that case claimed that due process required that she be advised of the specific grounds for her exclusion and be afforded a hearing where she might refute them. The Supreme Court held that under the circumstances of the case such procedures were not constitutionally required. In so holding the Court reaffirmed its earlier position that the Fifth Amendment did not require a trial-type hearing in every conceivable case of government impairment of a private interest and that "due process" is not a technical conception with a fixed content unrelated to time, place, and circumstances.

In Cafeteria and Restaurant Workers Union Local 473 v. McElroy, 367 U.S. 886 at 897–898, 81 S.Ct. 1743 at 1750, the Supreme Court, in commenting on their previous decisions in United Public Workers of America v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) and Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), where the individual's interest in public employment was recognized as entitled to constitutional protection, said,

In United Public Workers the Court observed that "[n]o one would deny" that "Congress may not 'enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any

active part in missionary work.' " 330 U.S. at page 100, 67 S.Ct. at page 556. In Wieman * * * the Court said, "We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory." 344 U.S. at page 192, 73 S.Ct. at page 215 * * *

Those cases demonstrate only that the state and federal governments, even in the exercise of their internal operations, do not constitutionally have the complete freedom of action enjoyed by a private employer. But to acknowledge that there exist constitutional restraints upon state and federal governments in dealing with their employees is not to say that all such employees have a constitutional right to notice and a hearing before they can be removed. We may assume that Rachel Brawner could not constitutionally have been excluded from the Gun Factory if the announced grounds for her exclusion had been patently arbitrary or discriminatory—that she could not have been kept out because she was a Democrat or a Methodist. It does not follow, however, that she was entitled to notice and a hearing when the reason advanced for her exclusion was, as here, entirely rational and in accord with the contract with M & M.

In an effort to differentiate between which government actions in employment practices were subject to constitutional safeguards and which were not so limited, the Supreme Court in *Cafeteria and Restaurant Workers, supra,* 367 U.S. at 895, 81 S.Ct. at 1748, announced the factors which must be weighed in any decision affecting public employment. The Supreme Court seemed to envision a flexible concept when it stated,

As these and other cases make clear, consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.

In the case of a university professor, the balancing type test enunciated by the Supreme Court in *Cafeteria Workers* seems to be the appropriate and controlling standard. However, the standard envisions a great degree of flexibility as it applies to the myriad of jobs in public employment and consequently will entail many variations. However, there are many other very illuminating precedents which are applicable to such a difficult decision.

In Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed. 2d 796 (1957), where a prospective lawyer had been barred from becoming a licensed member of the state bar, the Supreme Court held in the grant of relief, at 238–239, 77 S.Ct. at 756:

A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. * * * Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards. * * *

The easy answer to the applicability of the *Schware* case is that *Schware* dealt with the general right to practice a profession and did not deal with the narrow question of a right to specific employment. The same argument was made in Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), and was answered by the Supreme Court at 191–192, 73 S.Ct. at 219:

We are referred to our statement in Adler [Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952)] that persons seeking employment in the New York public schools have "no right to work for the State in the school system on their

own terms. United Public Workers v. Mitchell. * * * They may work for the school system upon the reasonable terms laid down by the proper authorities of New York." 342 U.S. at page 492, 72 S.Ct. at page 384. To draw from this language the facile generalization that there is no constitutionally protected right to public employment is to obscure the issue. * * * We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion * * * is patently arbitrary or discriminatory.

In Birnbaum v. Trussell, 371 F.2d 672 (2nd Cir. 1966), the United States Court of Appeals for the Second Circuit reviewed a suit brought under the Civil Rights Act by a physician who was dismissed from a municipal hospital in Brooklyn, New York, without written notice of charges. Other city hospitals were notified not to put Dr. Birnbaum on their staffs. He was later told his discharge was because of his "anti-Negro" bias which had been complained of by union employees working at the hospital. The court of appeals sustained the lower court's ruling that plaintiff did not allege facts sufficient to establish a deprivation of equal protection of laws under 42 U.S.C.A. Section 1985(3), but held a claim was stated for a conspiracy to violate 42 U.S.C.A. Section 1983. The court, after reviewing the existing cases, noted:

> The principle to be extracted from these cases is that, whenever there is a substantial interest, other than employment by the state, involved in the discharge of a public employee, he can be removed neither on arbitrary grounds nor without a procedure calculated to determine whether legitimate grounds do exist. 371 F.2d at 678.

The Court then stated that it considers "the ability to pursue a profession effectively" to be a substantial interest and noted that this interest has received "meticulous protection * * * to prevent direct injury by arbitrary state action." 371 F.2d at 678–679 n. 13.

Immediate temptation exists to distinguish the denial of the license to practice law or the discharge of the city doctor from the status of the nontenured teacher whose contract is not renewed. However, analysis makes such distinction superficial. In each situation, the right to the specified job is not in issue; rather the focal point is the personal liberty to pursue one's employment without arbitrary vilification and reckless exclusion by the state.

The United States Court of Appeals for the Fourth Circuit has had the opportunity on three different occasions to pass upon the constitutional requirements in the employment of public school teachers. In Parker v. Board of Education of Prince George's County, Maryland, 348 F.2d 464 (4th Cir. 1965), on which the defendants rely heavily in their brief, the Fourth Circuit declined to pass upon the constitutional issues and relied solely on the express terms of the contract. In that particular case, the teacher involved was in his very first year as a probationary teacher and the contract contained an express termination clause to the effect, "that either of the parties to this contract may terminate it at the end of the first or second school year by giving thirty days' notice in writing to the other during the month of June or July." In that case the termination was in strictest accord with the contractual agreement. The Court noted that by the terms of the contract nothing was offered but provisional employment wholly without academic tenure expressed or implied. The district court noted that it was not disputed that the plaintiff had had an opportunity to present his side to his educational superiors. It was the considered opinion of both the district and appellate court that no more than this should be required and that a full hearing before the county school board should be denied.

However, in the present case quite a different factual situation is involved

than that involved in *Parker, supra*. In the present case, there was no express provision as to termination of employment in the contract received by Mrs. Holliman. As has been stated earlier, her "contract" consisted of a salutary greeting, an offer of employment, a recital of the proposed salary, and a statement that the faculty was to be governed by the American Association of University Professors' 1940 Statement of Principles of Academic Freedom and Tenure. Also, Mrs. Holliman has been continuously employed for five consecutive years by Radford College receiving substantial raises over that period as opposed to the first year probationary employment involved in *Parker, supra*. In addition, there is much dispute as to whether Mrs. Holliman has been afforded an opportunity to present her side to her educational superiors. It has been alleged that the decision had already been reached before Mrs. Holliman had any idea of the controversy. Thus, although the principles involved in Parker v. Board of Education of Prince George's County, Maryland, *supra*, are entitled to much respect and consideration in the present case, it must be noted that the factual situations are different in many significant respects.

In Franklin v. County School Board of Giles County, 360 F.2d 325 (4th Cir. 1966), the Fourth Circuit granted a mandatory injunction requiring the school board to reinstate seven Negro teachers whose jobs had been terminated in the consolidation of the county school system. The Court held that their discharge was clearly in violation of their Fourteenth Amendment rights not to be discriminated against on account of their race. Clearly, there are some very real constitutional restraints on the exercise of the state's educational employment practices for which the Fourth Circuit has granted relief. One such issue which may not be considered by the state in the exercise of its discretion is race.

Perhaps the most applicable Fourth Circuit case to the present situation is Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966) where the Court of Appeals held that minor infractions allegedly committed by a high school teacher who had an excellent record over a twelve year period were neither individually nor collectively such as to justify the school board's failure to renew her contract. Included among her derelictions were an alleged failure to stand at her classroom door and supervise pupils as classes changed and an alleged failure to see that cabinets in her home room were clean and free of paper. Alleged as the real reason for her nonrenewal as a teacher was her exercise of her constitutional rights in protesting racial discrimination in the local community. The Court of Appeals, in considering the fact that there was no right under North Carolina law to continued employment, outlined the test of law to be applied, 364 F.2d at 179–180:

> The law of North Carolina is clear on the procedure for hiring teachers. All contracts are for one year only, renewable at the discretion of the school authorities. A contract must be signed by the Principal as an indication of his recommendation and then transmitted to the District School Committee, whose business it is either to approve or disapprove in their discretion (N.C.G.S. § 115–72). There is no vested right to public employment. No one questions the fact that the plaintiff had neither a contract nor a constitutional right to have her contract renewed, but these questions are not involved in this case. It is the plaintiff's contention that her contract was not renewed for reasons which were either capricious and arbitrary or in order to retaliate against her for exercising her constitutional right to protest racial discrimination.

> The Supreme Court has recently had occcasion to consider the law in this and analogous areas. It has pointed out on numerous occasions the importance of the teaching profession in our democratic society and the necessity of protecting its personal, associational and academic liberty. "Scholarship

cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always be free to inquire, to study and to evaluate * *." Sweezy v. State of New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957); Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952).

The Court put considerable reliance on the Supreme Court's decision in Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) where the Court struck down an Arkansas statute which required teachers to list every organization to which they belonged or contributed as violative of the due process clause of the Fourteenth Amendment. In that case, as in the case then before the Court, the school board had refused to renew a teacher's contract at the end of the school year. The Court of Appeals quoted with approval the Supreme Court's reasoning in Shelton v. Tucker, *supra:*

> Such interference with personal freedom is conspicuously accented when the teacher serves at the absolute will of those to whom [the] disclosure must be made—those who any year can terminate the teacher's employment without bringing charges, without notice, without a hearing, without affording an opportunity to explain. * * * Public exposure, bringing with it the possibility of public pressures upon school boards to discharge teachers who belong to unpopular or minority organizations, would simply operate to widen and aggravate the impairment of conditional (sic) liberty. (364 U.S. at 486–487, 81 S.Ct. 247, 251).

The Court of Appeals commented on their earlier holding in Franklin v. County School Board of Giles County, *supra,* and on the extent of discretion lodged in the school board when it held in Johnson v. Branch, *supra,* 364 F.2d at 180–181:

> There the Board contended that they had, in the act of failure to renew the contracts, compared the qualifications of the teachers with others in the system and found them inferior, but the record disclosed no objective evidence of such inferiority in the face of equal certification and experience. However wise the discretion of School Boards, it cannot be exercised so as to arbitrarily deprive persons of their constitutional rights. Zimmerman v. Board of Education, 38 N.J. 65, 183 A.2d 25, 27–28 (1962); Garner v. Board of Public Works, 341 U.S. 716, 725, 71 S.Ct. 909, 95 L.Ed. 1317 (1951). The principle has often been applied in analogous situations. Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957).
>
> * * * * * *
>
> The statute gives discretion to the school board in deciding whether or not to continue the employment of a teacher. *Discretion means the exercise of judgment, not bias or capriciousness. Thus it must be based upon fact and supported by reasoned analysis.* In testing the decision of the school board the district court must consider only the facts and logic relied upon by the board itself. (emphasis added)

Thus, it appears that the Court of Appeals for the Fourth Circuit has clearly recognized that, even in the situation of a teacher hired from year to year at the discretion of the hiring body, due process guarantees that one must not be arbitrarily deprived of his constitutional rights. The exercise of discretion concerning a teacher's non-retention must be based on the exercise of judgment, not bias or capriciousness, and his termination certainly must not be in retaliation for the exercise of any constitutionally protected right by the

teacher. Such a judgment must be based on fact and supported by reasoned analysis. This approach is entirely consistent with the Supreme Court's ruling in Cafeteria and Restaurant Workers Union Local 473 v. McElroy, *supra,* and envisions the balancing test therein set forth.

The question then reduces itself to what are the relative rights, duties, and interests involved in this particular case of a university professor employed by a state school. The test involved in Cafeteria Workers v. McElroy, *supra,* entailed a determination of both the public and private interests involved, in order to ascertain what were the requirements of "due process" in any given situation. In the present case of Mrs. Holliman the private interests involved are significant. Her opportunity to teach at the college level will all but be eliminated for the time being if her employment is not continued at Radford College. She is married to a professor at Virginia Polytechnic Institute and State University and lives in Blacksburg. Because of the rule that husbands and wives may not both be employed at the Blacksburg school, her opportunity to teach in a college in the immediate area may be put to an end. The nearest college community is in Roanoke, Virginia, a considerable distance away. Thus, the effects of her nonretention will go much deeper than to deny her the opportunity to work at one isolated and specific job, but will rather effectively preclude her from college level employment in the general geographic area.

Also to be taken into account is the fact that a teacher's ability to earn a living by pursuing his profession is somewhat different from other professions such as law or medicine. The teacher's opportunities are more narrowly confined. He or she works and is involved in the academic community where there are fewer employers. Discharge or release from one such employer certainly has an adverse effect upon the future availability of economic opportunities for the teacher because of the limited number of possible employers.

Discharge or release from a teaching position is surely a more severe impediment in the search for further employment than in many other fields of employment. There can be no question that nonretention by one particular college or university may create serious difficulties in a teacher's later academic career. Realistically, the ramifications of such a decision will be serious and restrictive and quite possibly will follow a professor for the remainder of his academic career.

As against the very real danger to the individual professor's reputation and later career is to be set the interest of the university in bringing together a faculty of the highest possible level of competency, responsibility, and devotion to duty. It is, of course, vital to this interest of upholding the integrity of the institution that the university be able to screen the teachers it employs as to their fitness during a relatively short initial period when the teacher is a probationer. It is certainly reasonable that there should be sufficient time to observe a new teacher in all facets of university life and that during that time the institution should be afforded considerable latitude in deciding whether to retain the new teacher. The tenure system obviously has a strong rational basis in this regard because after a certain period of time or after the newcomer has won a certain measure of respect from his colleagues in the academic community, he then acquires rather strong protection against nonretention. Such an arrangement is conducive to maintaining the level of competence of the faculty as well as being conducive to productive and sometimes controversial effort. As was stated by the United States District Court for the Western District of Wisconsin when confronted with a similar situation of nonretention in Roth v. Board of State Colleges, 310 F. Supp. 972 (W.D.Wis.1970) at 978–979:

Thus it is reasonable that there be available a very wide spectrum of reasons, some subtle and difficult to articulate and to demonstrate, for

deciding not to retain a newcomer or one who has not yet won sufficient respect from his colleagues. And it is reasonable that thereafter this available spectrum of reasons be sharply narrowed and confined to those amenable to articulation or demonstration. The core issue here, however, is more difficult. No interest of the university is directly served by a regime in which a decision not to retain a newcomer may be made upon a basis wholly without support in fact or by a decision upon a wholly unreasoned basis. If the university is forbidden, constitutionally, to rest its decision on such an arbitrary basis, the question arises: in practice will the university become so inhibited that the available spectrums of reasons for non-retention in two situations will merge, the distinction between tenure and absence of tenure will shrink and disappear, and the university will be unable to rid itself of newcomers whose inadequacies are promptly sensed and grave but not easily defined? It will not do to ignore this danger to the institution and to its central mission of teaching and research.

█ As has been discussed earlier in this opinion the Court is of the opinion that the cases heretofore alluded to [1] compel the conclusion that the due process clause of the Fourteenth Amendment forbids a state university from basing its decision not to retain a professor, even probationary, on a ground wholly unsupported in fact or on a ground totally without reason. It is most important that this standard is considerably less severe than the standard of "cause" used in the dismissal of tenured faculty. To recognize this due process limitation on the hiring discretion of state universities is in no way to raise nontenured positions to tenured status. Nor does it mean that the federal courts under the auspices of the Civil Rights Act will become a haven for every disgruntled college professor

whose contract is not renewed. As the Supreme Court has recently stated:

> Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. * * * By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. On the other hand, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231, [236] (1960).

Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).

█ The bodies responsible for maintaining academic excellence may still exercise their discretion in hiring, retaining, or severing all connections with a probationary teacher. What is required is that the exercise of their discretion must be based on facts and reasoned analysis. The Court is cognizant of the plethora of reasons why a university would rather not retain a particular professor. Many are subtle and difficult to demonstrate or even articulate, but are still very necessary to the smooth functioning of a large academic community. To be very clear, the Court will be bound to respect bases for nonretention enjoying very minimal factual support and supported by subtle reasons. Certainly the college is not required to set down a list of standards, compliance with which will result in achieving tenure, or to justify its actions beyond a reasonable doubt when a nontenured professor's employment is not continued. When the college's discretion is challenged, the burden of proof will be upon the teacher to demonstrate constitutionally impermissible grounds.

---

1. Cafeteria and Restaurant Workers Union Local 473 v. McElroy, *supra*, Franklin v. Giles County School Board, *supra*, and Johnson v. Branch, *supra*.

■ While it would perhaps have been preferable for Radford to furnish written reasons to Mrs. Holliman for her nonretention and to allow her an opportunity to appear before the appropriate body to clear up any factual disputes, the Court concludes that the plaintiff did not have any absolute right to such procedures. In this respect the Court differs from the conclusion reached in Roth v. Board of State Colleges, 310 F. Supp. 972 (W.D.Wis.1970), which contains a painstaking and thoughtful analysis of the same problem facing this Court. The Court will follow its recent decision in Hodgin v. Noland, 435 F.2d 859 (4th Cir. 1970), which held that a public librarian serving at the will of the municipal corporation was not entitled to have a formal notice of charges or a formal hearing before he could be dismissed.

■ A nontenured professor only has a right to a statement of reasons for his nonretention in that he has a right not to be discharged for an improper reason or for no reason at all. In other words, if the college when brought into Court refuses to give any reason for its action and relies solely on its discretionary authority, the professor would be entitled to summary reinstatement. On the other hand, if the college refused to give the professor any reasoning for its action prior to Court proceedings but then gave a valid reason which could be substantiated, the professor's rights would not have been infringed. In summary, at some point the college should be compelled either to disclose its reasons or to reinstate the teacher.

■ The college should be willing to give its reasons at the earliest possible stage but the professor does not have a constitutional right to such a disclosure during administrative proceedings. There being no absolute right to receive during the administrative process a statement of reasons for nonretention, there is accordingly no constitutional right to an administrative hearing so that the teacher can present his arguments. Admittedly, however, the use of these procedures may be advisable and in the best interests of all concerned.

In the present case, however, it appears that the plaintiff has received informal notice of three reasons for nonretention. The reasons were received orally but, nevertheless, she has been apprised of the reasons.

The reasons were (1) that her teaching was adequate but only adequate, (2) that she was not sufficiently involved in campus affairs, and (3) that she did not exhibit significant signs of professional growth in that she neither pursued a doctoral degree nor had any significant works published.

■ The Court feels that these reasons if substantiated, would perhaps justify Mrs. Holliman's nonretention on the basis that school was in the process of upgrading its faculty. The decision appears to rest on the reasoned analysis that these attributes are to be encouraged in all members of the college community. In regard to two of the alleged reasons for the college's nonretention of Mrs. Holliman, there appears to be a very real dispute as to the facts, *i. e.*, her adequacy as a teacher and her involvement in extracurricular campus affairs. There is no dispute, however, as to her inaction in pursuing doctoral work or in publishing scholarly works.[2] Clearly as to this final reason, there is both factual support and reasoned analysis demonstrated from the present record. This reason if applied without discrimination would justify nonretention even though the plaintiff may feel that it was unfair that the college did not inform her that further graduate studies were expected in a certain period of time.

■ Notwithstanding this reason and its support in the record, it is without question and both sides seem to agree

2. This reason seems to be the main one relied on by the Dean's Committee on tenure to justify the failure to grant tenure.

that a justifiable ground for discharge cannot be used as a defense when the reason given is a mere pretext and not the moving cause for the nonretention. When a permissible ground for discharge is assailed as a mere pretext for an otherwise invalid ground for discharge, the disputed question of fact may be submitted to a jury under appropriate instructions. Hodgin v. Noland, *supra.*

The Court is of the opinion that Mrs. Holliman has the right to present to a jury her allegation that her firing was actually occasioned by the exercise of some constitutionally protected rights or for some arbitrary, malicious, or unfounded reason. The reasons advanced by the college for her nonretention, although constitutionally sound in that they were legitimate grounds with factual support, cannot be used as a pretext to retaliate against her for an exercise of her constitutional rights or to cover some other improper reason. If a jury resolves the question of fact in favor of Mrs. Holliman, her reinstatement will then be in order.

The question of whether the plaintiff may be entitled to damages remains. It is clear that the Board of Visitors itself is not liable for monetary damages because "bodies corporate, which are agencies of state government, are not amenable to damages under Section 1983." Kirstein v. Rector and Visitors of the University of Virginia, 309 F.Supp. 184, 188 (E.D.Va.1970) (3 judge court). That case involved the right of applicants to attend the University of Virginia at Charlottesville without regard to their sex. While holding that the plaintiffs were entitled to attend the University, the Court held that the Board of Visitors was not liable for damages in any case and that the individual defendants were not liable because they had continued long established policies in good faith.

In this case, however, it is contended that the individual defendants, Dr. Martin and Mr. Muse, acted maliciously and/or arbitrarily to the detriment of the plaintiff. The Court does not feel that the record supports any malicious action on the part of Dr. Martin or Rector Muse, and thus no monetary damages should be assessed against either of them.

Therefore, upon the foregoing authority and reasoning, it is adjudged and ordered that the plaintiff's motions for immediate reinstatement, for a formal written notice under oath of the reasons for her nonretention, and for the requirement of a full adversary hearing at the administrative level are hereby denied.

The defendants' motion to dismiss and motion for summary judgment are also denied.

It appearing that the present factual situation will not be easily amenable to the maintenance of a class action, the plaintiff's request to proceed in that fashion is denied.

This cause will be set for a trial by jury for resolution of the factual issues involved, and thereupon the Court will enter an appropriate order and judgment determining all legal and equitable issues involved.