Nicholas MESCIA, Plaintiff,

v.

C. C. BERRY et al., Defendants.

Civ. A. No. 73–1588.

United States District Court,
D. South Carolina,
Florence Division.

Aug. 23, 1974.

Frank Epstein, Charleston, S. C., for plaintiff.

Augustine T. Smythe, Charleston, S. C., William B. Hawkins, Dillon, S. C., Kenneth Woodington, Asst. Atty. Gen., Columbia, S. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CHAPMAN, District Judge.

The plaintiff, Nicholas Mescia, a white school teacher, alleges that the defendants refused to renew his contract of employment as a school teacher for the 1972–73 school year because of his association with black persons in the Dillon Community, his religion (Roman Catholic), his place of birth (New York City) and his appearance before an investigating committee of the National Education Association. The plaintiff further alleges that this action was arbitrary and capricious and that he was denied procedural process. Plaintiff seeks reinstatement, damages and injunctive relief. The defendants deny that their action was based on constitutionally impermissible reasons, that their decision was arbitrary and capricious or that the plaintiff was denied due process.

This case was tried without a jury on August 5 and 6, 1974. The Court heard testimony of 11 witnesses and considered 11 depositions. At the conclusion of the trial, the parties were given the right to file supplemental briefs and these have been filed and reviewed by the Court.

After hearing and considering all of the testimony offered by the parties, reviewing the exhibits and briefs, and studying the applicable law, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. Plaintiff, Nicholas Mescia, is a citizen and resident of Dillon County, South Carolina and was employed by the Dillon County Board of Education as a teacher for the school years 1970–71 and 1971–72.

2. Plaintiff was born, reared and educated in the public schools of New York City. He is a Roman Catholic and received a Bachelor of Arts degree from Pembrook State College in North Carolina. He came to Dillon because of his marriage to a native of that city.

3. The defendants are: Mr. C. C. Berry, Mr. John E. McQueen, Glenn Turbeville, Mr. Tom Kennedy, and Mr. Howard Sloan sued individually and in their official capacities as members of the Board of Trustees of Dillon School District No. 2. Mrs. Ann Gibson and Mrs. D. C. Perry are sued in their official capacities as

members of the Board of Trustees of Dillon School District No. 2. Dr. W. H. Mitchell is sued in his official capacity as Superintendent of Dillon School District No. 2. Mr. H. E. Corley, former Superintendent of Dillon School District No. 2 is sued individually and in his former official capacity as Superintendent of Dillon School District No. 2. Mr. Phil B. Brown, Mr. W. Gordon Lynn, Mr. Tracy Finklea, Mr. M. H. Cox, Mr. Floyd Bethea, Mr. Robert Miller, Mr. Preston Green, Mr. Neal Rogers, Mr. Mendel Smith and Mr. Robert J. Smith, are sued individually and in their official capacities as members of the Board of Education of Dillon County. Mr. Victor Berry is sued individually and in his official capacity as Superintendent of the Board of Education of Dillon County. Also named as defendants are Dillon District No. 2 and the Board of Education of Dillon County.[1]

4. Plaintiff was employed as a teacher at St. Mary's High School in New York City during the 1969–1970 school year. He married Cecilia Minshew, a native of Dillon, South Carolina, on March 17, 1970, and the couple resided in an apartment in New York City. After approximately one month, the couple began to have severe domestic difficulties which resulted in a separation. The plaintiff's wife returned to Dillon in April 1970 and did not return to New York City until August 1970. At this time the couple reconciled and returned to Dillon in an attempt to continue their marriage. In August 1970, the plaintiff applied for a teaching position with Dillon School District No. 2. This application reflected plaintiff's place of birth, previous education, his religious affiliation and prior employment. As a result of this application, plaintiff was employed as a Social Studies teacher for the school year 1970–71 at Dillon High School. He was later reemployed for the year 1971–72. Each contract specifically

stated that the term of employment was for one year. Each contained, among others, the following conditions:

"(b) I shall endeavor to place the school's welfare above personal interest and keep physically fit to render efficient service.

(c) I shall conduct myself with due decorum, both in the school and out of school such as becomes the position to which I am elected.

(d) I shall always uphold the high ethical standards of the teaching profession in all my contacts with pupils, parents, school officials and other members of the community.

(e) I shall submit my resignation, if in the opinion of the District Superintendent and a majority of the Board any of these conditions or provisions be violated. Resignation to be submitted upon the request of the Superintendent and the Board of Trustees. Thirty days notice is to be given by the Board of Trustees before the services of said teacher are severed from the school."

Both contracts were signed by the plaintiff and the defendant, Mr. H. E. Corley, as the Superintendent of School District No. 2. The contract for the 1970–71 school year called for a salary of $5,827.00 and the contract for the 1971–72 school year called for a salary of $6,249.00.

5. In September 1970, the couple's severe domestic problems resumed. At this time, the couple lived in a duplex apartment in Dillon. Plaintiff testified that his wife came and went as she pleased. It was during this period, that plaintiff learned that his wife was pregnant. He testified that frequently she became violent, smashed windows in their apartment, and on three separate occasions smashed the picture tube in their television set. She also assaulted plaintiff with a bottle on one occasion

---

1. The *Huntley v. N. C. State Board of Education* case 493 F.2d 1016 (4th Cir. 1974) would seem to indicate that the N. C. State Board apparently was not a "person" within the meaning of 42 U.S.C. Sec. 1983 upon which, in conjunction with 28 U.S.C. Sec. 1343(3), the district court's jurisdiction was based.

and threw a knife at him on another. In December 1970, plaintiff's wife left him, and plaintiff testified that she moved from place to place living with various friends. During this period, plaintiff would search for his wife and upon finding her, loud arguments would often ensue. Their child was born in May 1971, and a dispute arose at the hospital over the baby's name. After the child's birth, plaintiff's wife refused to allow him to see his son, but he was able to visit the child when it was left at his wife's parents' apartment. On one occasion while he attempted to see the child at his in-law's apartment, the police were called to force him to leave. Plaintiff was not arrested, but was ushered from the apartment by the officers. After this incident in the summer of 1971, the couple apparently reconciled again. During the fall of 1971, the couple lived in a duplex apartment in the City of Dillon. It appears that their domestic problems continued and the wife, as before, came and went as she pleased. On one occasion during this period, the plaintiff's wife secured a warrant for his arrest. As a result the plaintiff was arrested on Main Street in Dillon while walking his son in a stroller on Sunday morning. Plaintiff was frisked on the street, handcuffed and placed in jail for approximately 45 minutes.

6. In December of 1971, plaintiff became concerned over his child's health. He testified that he took the baby against his wife's will to New York City and left him with his parents. As a result of this trip plaintiff was absent from his teaching duties for approximately one week. It appears that satisfactory arrangements were made with the school principal regarding a substitute teacher for the plaintiff's classes. Upon his return, the plaintiff was informed that Superintendent Corley wished to see him. At this conference Superintendent Corley discussed with the plaintiff his marital difficulties and his trip to New York. The plaintiff explained his marital difficulties including the incident in which he was arrested.

Superintendent Corley suggested that the plaintiff appear before the Board of Trustees of District No. 2 at its January meeting to speak in his own behalf regarding his domestic difficulties. Prior to the board meeting the couple again reconciled, went to New York and brought their child back to Dillon. It appears that their domestic problems began again almost immediately upon their return from New York.

7. The plaintiff appeared before the Board of Trustees of District No. 2 on January 24, 1972. The meeting consisted of plaintiff's discussing his marital difficulties and an explanation of his trip to New York. Plaintiff testified that he told the Board that he had no control over his wife's actions. Sometime after the January 24 board meeting, plaintiff again conferred with Superintendent Corley and was informed that he had made a favorable impression upon the Board.

8. In February 1972, plaintiff's wife burst into his classroom and threatened his life in front of a class of approximately 25 students. As a result of this incident, plaintiff was again summoned by defendant Corley for a conference. Superintendent Corley informed the plaintiff of the seriousness of this incident and of his concern for the safety of the students and teachers at Dillon High School. He further informed the plaintiff that as a result of this incident that he could not recommend that the plaintiff's contract be renewed for the 1972–73 school year. Superintendent Corley also informed the plaintiff that in view of the seriousness of the incident that it might be necessary to swear out a warrant restraining plaintiff's wife from coming upon school property. Plaintiff testified that he agreed with this action and again stated that he could not control his wife. One week later plaintiff asked Corley if the warrant had been procured. At this time Corley informed him that a decision had been made not to seek such a restraining order. Plaintiff further testified that immediately following the classroom incident, his wife

kicked him out of their apartment. He moved at this time to Dillon Garden Apartments, an integrated housing project.

9. In March the plaintiff was again asked to meet with Superintendent Corley. This meeting concerned a letter from the National Education Association indicating that plaintiff and two of his colleagues were to be interviewed by the association in connection with a state-wide investigation. Plaintiff's colleagues had likewise been summoned to the meeting and both testified as to what transpired. Defendant Corley apparently assumed that the plaintiff and his colleagues had requested the interviews because of grievances against the Dillon School System. He testified as did plaintiff and the two colleagues that Corley was upset because none of their grievances had been brought to him prior to the resort to N.E.A. The plaintiff and his colleagues denied any request on their part to N.E.A., but apparently defendant Corley disbelieved them. The teachers testified that the defendant informed them "that contract renewal time was near and that two could play at the same game", and they testified that they felt intimidated by this remark. The defendant testified that while he denied knowledge of the remark at deposition, he would have to assume it was made in light of the other three recollections. It appears that both plaintiff's colleagues were recommended for reemployment by Superintendent Corley. One is still employed with the Dillon School System while the other declined reemployment in Dillon for the 1972–73 school year in order to take a position in an administrative capacity in another school district. Corley testified that he did not base his decision in not recommending the plaintiff on the incident described; but, instead, his recommendation was based upon plaintiff's domestic difficulties and their effect upon the school system and the Court agrees with this and finds that the N.E.A. incident did not cause plaintiff's failure to be reemployed.

10. The Board of Trustees of Dillon School District No. 2 met on April 4, 1972, and received the recommendations from various school principals and superintendents concerning the renewal of teachers at their schools for the1972–73 school year. Prior to this meeting, the co-principals of Dillon High School had filled out a form indicating their recommendations for each teacher presently employed at the school. All teachers, including the plaintiff, were recommended for reemployment for the 1972–73 school year by the co-principals. However, the co-principals were aware of Corley's feelings and prior statement as to plaintiff's future at Dillon High School and they left blank the section of the report which indicated whether plaintiff was expected to return for the next school year. Prior to meeting with the Board of Trustees, the co-principals conferred with Superintendent Corley on these recommendations. Superintendent Corley informed the co-principals that he could not recommend the plaintiff and he superimposed an "X" over the checkmark by Mr. Mescia's name. During the meeting of the Board of Trustees, this change in recommendation was questioned. Mr. McQueen, a member of the Board of Trustees, asked the co-principals if they concurred in the non-reemployment of plaintiff. Both co-principals, after some hesitation, answered that they concurred in the recommendation as it stood. The Board of Trustees took no action at this meeting concerning the reappointment of the faculty members at Dillon High School. A special meeting of the Board of Trustees was held on April 10, at which the Board made the decision to reemploy all the teachers at Dillon High School recommended by the Superintendent and co-principals. The plaintiff therefore was not offered reemployment for the 1972–73 school year. As a result of this action of the Board, plaintiff was informed orally by Corley that his contract would not be renewed. Plaintiff wrote to Corley and asked that the reasons for his non-renewal be put in writing. In re-

sponse Superintendent Corley wrote plaintiff the following letter on April 19:

"Dear Mr. Mescia:

In answer to your request that we put in writing the reasons for your non-re-election as a teacher at Dillon High School I submit the following as my understanding of the reasons behind the Board's decision. It had been brought to the attention of the school officials that your out of school activities and personal problems were jeopardizing your influence as a teacher in the community.

You, of course, have the right to appeal this decision to the local Board of Trustees, then to the County Board of Trustees and then to the Court of Common Pleas of Dillon County.

With kindest personal regards, I remain,

Sincerely yours,

H. E. Corley, Superintendent"

In response to this letter, the plaintiff went to the Superintendent Corley's office. He was informed by Corley that he could appear before the Board to appeal this decision. Plaintiff asked if he should obtain counsel for this meeting before the Board of Trustees. Superintendent Corley advised plaintiff that if he brought an attorney to the meeting the Board would probably bring in an attorney, but Corley did not tell plaintiff that he could not or should not bring an attorney. Plaintiff appeared before the Board on May 22, 1972, and made a statement. In his statement the plaintiff informed the Board that he felt his non-renewal was based on the fact that he was "a yankee", a Catholic and that he associated with black colleagues. He informed the Board that he lived in an integrated housing project, and that he felt this was also a basis for their decision. He again discussed his domestic difficulties and informed the Board once again that he had no control over his wife. He stated that he had retained a lawyer and was in the process of divorcing his wife. He argued that his principals had recommended him and that he

felt he had been a good influence on the students. It appears that the Board asked him no questions but informed him that they would consider the information he had submitted. On May 23, 1972, Superintendent Corley wrote the plaintiff informing him that the Board had not reversed its earlier decision and that his contract for the 1972–73 school year would not be renewed. He advised the plaintiff that this decision could be appealed through Mr. Victor Berry, Dillon County Superintendent of Education to the Dillon County Board of Education. The plaintiff appeared before the Dillon County Board of Education in July of 1972. At this meeting he was represented by counsel; and he, as well as his attorney, made statements to the County Board. Plaintiff nor his attorney followed the procedures specified in Section 21–247 of the South Carolina Code of Laws 1962, as amended, for appeals of this nature. They did not serve the requisite written petitions on the Chairman of the Board of Trustees, the Chairman of the County Board or the adverse party. Had they done this the County Board would have been authorized to hear the matter *de novo* pursuant to Section 21–247 et seq. Plaintiff's statement was essentially the same as that made to the District Board. His attorney asked that the County Board furnish the plaintiff with the reasons for their decision in writing. The County Board informed the plaintiff by letter dated August 10, 1972 that the Board was unanimously affirming the action taken by the Dillon District No. 2 Board.

11. The Court finds that the Board's action in not renewing the plaintiff's contract was based upon the plaintiff's domestic problems and their concern for the welfare of the school and the safety of the students. It should be pointed out that the plaintiff on two occasions told Superintendent Corley, and the Board on one occasion, that he could not control his wife and thus could not be sure that there would not be a repeat of the February incident. The Court finds that plaintiff's place of birth, his reli-

gion, his outside employment, or his association with blacks had nothing to do with the Board's decision. The Court further finds that the School Board did not know that plaintiff had moved into a predominantly black housing project or that he associated extensively with black persons until after its decision on April 10. Plaintiff's own statement to the Board at the time of his appearance before them in May was the first information that the Board members had regarding his residence or his social activities involving any black members of the community.

12. Superintendent Corley's letter of April 19, was sufficiently specific to inform the plaintiff of the grounds for the Board's decision. This is particularly true in view of the fact that plaintiff had discussed these problems with Superintendent Corley on at least two occasions and had discussed them with the Board of Trustees on one occasion prior to the Board's decision.

13. The plaintiff was hired on a year to year basis. He was not discharged during the term of his contract nor was his contract cancelled. Plaintiff was advised of his right to appeal the Board of Trustees' decision but he failed to follow the provisions of the South Carolina Code by filing a verified petition.

## CONCLUSIONS OF LAW

Plaintiff alleges that the defendants' decision not to renew his contract of employment for the 1972–73 school year infringed his constitutional rights. He thus brings this action pursuant to 42 U.S.C. 1983 and this Court's jurisdiction is based upon 28 U.S.C. 1343(3). He has attacked this decision both in substance and procedure. First, he has alleged that the true reason for the decision was in retaliation for his association with black people in the community, his religion, place of birth and his association with the National Educational Association manifested by the appearance of his name on a list of teachers to be interviewed by that organization. Secondly, plaintiff alleges that he was denied procedural due process because, among other things, he was not given a hearing prior to the decision not to renew his contract.

While plaintiff must show that he had a sufficient "property" or "liberty" interest in the renewal of his contract to invoke the procedural due process protection afforded by the Fourteenth Amendment, such is not the case with his substantive due process claims. Since the Supreme Court's decision in *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). It is well settled that a lack of a contractual or tenure right to reemployment is not necessary to support a claim that non-renewal of one's contract violates his First and Fourteenth Amendment rights. In this regard the Court in *Perry* made the following observation:

"For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly'. *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible.

\* \* \* \* \* \*

Thus, the respondent's lack of a contractual or tenure 'right' to re-employment for the 1969–70 academic year is immaterial to his free speech claim. Indeed, twice before, this Court has specifically held that the nonrenewal

of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights. *Shelton v. Tucker* [364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231], *supra; Keyishian v. Board of Regents* [385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629], *supra.* We reaffirm those holdings here today." 408 U.S. at 597, 598, 92 S.Ct. at 2697.

Thus it is clear that plaintiff's substantive claims with respect to his rights of freedom of association and privacy in no way depend on the question of whether or not he had tenure. For this reason the Court will address itself to these claims first.

■ Plaintiff alleges that the Board's decision not to renew his contract, which was made on April 10, 1972, was based upon his association with black persons, his religion, his place of birth, his marital problems and the fact that his name appeared on the National Education Association's list of teachers to be interviewed in a statewide investigation. This Court has found that the evidence points to a contrary conclusion. Each member of the Board of Trustees of School District No. 2 testified that they had no knowledge of where the plaintiff lived or whom he associated with until plaintiff himself brought these facts to their attention at their May 22 meeting. It should be remembered that the decision not to renew the plaintiff's contract was made some six weeks prior to the May 22 meeting. In addition, each testified that his vote was based upon the recommendation of defendant Corley and plaintiff's co-principals, as well as the plaintiff's domestic problems. It should be noted that plaintiff had himself discussed his domestic problems with the Board at its meeting on January 24, 1972 and that defendant Corley had apprised the Board of the February incident in which plaintiff's wife threatened his life while he was attempting to conduct a class. While defendant Corley admitted that he had been upset by the appearance of plain-

tiff's name, as well as the names of two other teachers on the N.E.A. list, it must be remembered that he had *previously* informed the plaintiff in February that he would not recommend plaintiff for reemployment because of his domestic problems and their effect upon the school system. In this connection it should be pointed out that of the three teachers whose name appeared on the N.E.A. list two were recommended for reemployment. There was no testimony to support the claim of discrimination because of plaintiff's religion or place of birth. His original employment application showed both his religion and place of birth and he was hired and worked two years in the school system. It is thus the opinion of this Court that the plaintiff has failed to prove that his non-renewal was based upon constitutionally impermissible reasons. The plaintiff was dismissed because of his domestic problems which in the Board's opinion jeopardized not only plaintiff's effectiveness as a teacher, but the safety of the students and teachers in the local school system.

■ Plaintiff argues that even if the Court finds the decision of non-renewal was based solely upon his domestic problems, that this would violate his right to privacy and marital association under the First, Ninth and Fourteenth Amendments. While this Court recognizes that such rights exist, it feels that the cases urged by the plaintiff are clearly distinguishable from the present situation. Plaintiff cites *Randle v. Indianola Municipal Separate School District,* 373 F.Supp. 766 (N.D.Miss.1974), as authority for this proposition, but the analogy between the case and the *Randle* case cannot withstand close scrutiny. In the *Randle* case the Court found that the defendant School Board's decision not to hire Mrs. Randle was based upon the opposition to her husband's civil rights activities. Mrs. Randle's husband had in no way threatened to disrupt the school activities nor was it reasonable to assume that such disruption was likely. The facts before this Court, however,

present a far different situation. For here plaintiff's domestic difficulties have spilled over into the schoolhouse itself. Plaintiff's testimony indicates that the School Board was aware of the fact that he had been threatened with death in front of his students by a woman who by his own admission had a history of violence toward him. Not only had she previously assaulted him with a bottle but had in fact, thrown a knife at him on at least one occasion. Also plaintiff had told the defendant Corley and the School Board that he had no control over his wife whatsoever. Thus we are not dealing with a situation where protective speech or association is at issue, but instead a potentially explosive and dangerous domestic conflict which had on a prior occasion disrupted school activities. While this Court does not deny that plaintiff has a constitutionally protected right to marry anyone he may choose, it is not willing to concede that these rights give the plaintiff or any other person the right to engage in domestic altercations in the classroom of a public high school thus creating damage to students and teachers alike. Rights and duties must be weighed, and the Board's duty to protect its students is paramount under the facts in this case.

Plaintiff alleges that the non-renewal of his contract violated his right to procedural due process guaranteed him by the Fourteenth Amendment, because he was not afforded a hearing prior to the Board's decision. The United States Supreme Court has recently dealt with this question in the companion cases of *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

In *Roth* the Court was faced with facts quite similar to the case before this Court. There the question was whether or not a professor hired under a year to year contract and who had not met the state's requirements for tenure was entitled to procedural due process prior to the University's decision not to renew his contract. It should be noted that the

South Carolina public school teachers do not have tenure. *Rackley v. School District No. 5*, 258 F.Supp. 676 (D.C.S.C. 1966). In answering this question the Court attempted to define the interest one must possess before he is entitled to invoke the Fourteenth Amendment and its protection of procedural due process. The Court stated:

> "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. . . . But the range of interest protected by procedural due process is not infinite." 408 U.S. at 569–570, 92 S.Ct. at 2705.

The Court reasoned that in order to ascertain, "whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Id. at 570–571, 92 S.Ct. at 2705. It then defined the "liberty" and "property" interests which must be present before one, who does not possess tenure and is not discharged during the term of his contract, must have before invoking the protection of the Fourteenth Amendment. Plaintiff alleges that though he had no tenure he did have a sufficient "liberty" and "property" interests to require the defendants to afford him a hearing prior to their decision not to renew his contract.

■ The Court in *Roth*, identified two such "liberty" interests, which, if present, would require a hearing prior to non-renewal. One such interest is present when charges are lodged against a non-tenured teacher, "that might seriously damage his standing and associations in his community. . . . (F)or example, that he had been guilty of dishonesty, or immorality." Id. at 573, 92 S.Ct. at 2707. Plaintiff urges that the reason given by the Board of Trustees for non-renewal of his contract—"that your out of school activities and personal problems were jeopardizing your influence as a teacher in the community" falls within the Court's definition. It is the opinion of this Court, however, that

these reasons cannot be likened to a charge of dishonesty or immorality, and thus not of sufficient severity within the Court's definition. Assuming *arguendo* that this Court is mistaken in its evaluation of the seriousness of these charges, we feel that this alone would not be sufficient justification for a finding that plaintiff's due process rights have been violated. In the recent case of *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Court modified to some extent its position in *Roth*—at least in regard to when the hearing to refute such charges must be held. In *Arnett* a non-probationary civil service employee was dismissed for allegedly having made recklessly false and defamatory statements. Under the applicable act and regulations the employee was given the right to be discharged only for cause. However, while he was to be given 30 days advance notice before removal and a copy of the charges, as well as the right to respond to those charges, he was not to be afforded an evidentiary-type hearing until after removal. A three-judge court had declared the act unconstitutional; because, among other reasons, the employee was not given an evidentiary-type predismissal hearing. In discussing the pertinent passages of the *Roth* case relied on by plaintiff here, a plurality of the Court made the following observation:

"The liberty here implicated by petitioner's action is not the elemental freedom from external restraint such as was involved in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484, but is instead a sub-species of the right of the individual 'to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.' *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042. But that liberty is not offended by dismissal from employment itself, but instead by dismissal based upon an unsupported charge which could wrongfully injure the reputation of an employee. Since the purpose of the hearing in such a case is to provide the person 'an opportunity to clear his name,' a hearing afforded by administrative appeal procedures after the actual dismissal is a sufficient compliance with the requirements of the Due Process Clause. Here appellee chose not to rely on his administrative appeal, which if his factual contentions are correct might well have vindicated his reputation and remove any wrongful stigma from his reputation."

■■ While there is no statute granting a school teacher the right to be removed only for cause, the parallel between the present case and the *Arnett* case is impressive. Plaintiff was allegedly aggrieved by the action of the Board of Trustees of District No. 2. The Board granted him the opportunity to appear and submit additional information. Plaintiff, however, asserts that he was never apprised of the reasons for his non-renewal, but it is clear that such was not the case in view of the fact that he had on two prior occasions been counseled by defendant Corley concerning his domestic problems and had appeared before the Board of Trustees for District No. 2 in this regard on one occasion. Just as in *Arnett* plaintiff was given the opportunity by statute to appeal to the County Board and secure a full evidentiary type hearing to clear his name. See Section 21–247 et seq. South Carolina Code of Laws 1962, as amended. However, plaintiff and his attorney evidently decided to forego this opportunity since they did not follow the applicable statutory procedure for securing a *de novo* hearing. It is the opinion of this Court that the reasons given for plaintiff's non-renewal were not of such gravity as to require a pre-non-renewal hearing, and that even assuming that they were, under the pronouncements of *Arnett v. Kennedy*, (supra), the post administrative appeal procedure which plaintiff did not take advantage of would have satisfied the due process requirements.

The plaintiff also argues that he has been denied the second liberty interest

defined by the Court in *Roth.* This "liberty" interest is present where ". . (T)he state, in declining to re-employ the respondent, imposed upon him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." 408 U.S. at 573, 92 S.Ct. at 2707. As pointed out above, this Court does not view the reasons given for plaintiff's dismissal as being of such a degree of severity as to impose a stigma upon him. A closer examination of the *Roth* opinion lends support to this conclusion. The Court there further defines "stigma or other disability" as follows, "The state, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case." 408 U.S. 573–574, 92 S.Ct. at 2707. While the plaintiff has testified that he has applied for other teaching positions in the state and has not secured any such positions, we hardly think that the mere non-renewal of plaintiff's contract in this one case has in any way barred him from all other school employment. See 408 U.S. at 574, n. 13, 92 S.Ct. 2701. Plaintiff testified that he is now employed by the Dillon County Health Department.

Plaintiff contends that he was entitled to procedural due process, because he had a sufficient "property" interest in his continued employment. It is, of course, clear under *Roth* and *Perry* that the contractual terms found in plaintiff's contract standing alone are insufficient to invoke the protection of the Fourteenth Amendment. See *Williams v. Hyde County Board of Education,* 490 F.2d 1231 (4th Cir. 1974). Plaintiff nevertheless argues that he had the "equivalent of tenure". In *Roth* the Court made the following observation in its discussion of property interests, "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or under-

standings that secure certain benefits and that support claims of entitlement to those benefits." 408 U.S. at 577, 92 S.Ct. at 2709. The Court continued "Nor, significantly, was there any distinct statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it." Id. at 578, 92 S.Ct. at 2710.

In the *Perry* case the Court expanded its definition of the "property" interest necessary to entitle one to the protection of the Fourteenth Amendment, where the respondent had taught in the state college system of Texas for ten years. The last four years of this ten year period had been spent at Odessa Junior College under a series of four successive one year contracts. As in *Roth,* the college had not dismissed plaintiff during the term of his contract, but had refused to renew his contract. He alleged that although there was no formal tenure program at Odessa, he was entitled to due process prior to a decision not to renew his contract because his interest in reemployment "was secured by a no less binding understanding fostered by the college administration." As a basis for this claim that he had "defacto tenure", the plaintiff relied upon the following from the college's official faculty guide:

> "Teacher tenure: Odessa College has no tenure system. The Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work." 408 U.S. at 600, 92 S.Ct. at 2699.

In addition, respondent claimed reliance upon certain guidelines which had been promulgated by the coordinating board of the Texas College and University System. In discussing this claim the Court reiterated its position in *Roth* that a "property interest" could be based upon rules or mutually explicit understandings. In summarizing its position with respect to the respondent's claim

the Court made the following observation:

"A teacher, like the respondent, who has held his position for a number of years, might be able to show from the circumstances of this service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure. Just as this Court has found there to be a 'common law of a particular industry or of a particular plan' that may supplement a collective-bargaining agreement . . . so there may be an unwritten 'common law' in a particular university that certain employees shall have the equivalent of tenure." 408 U.S. 602, 92 S.Ct. at 2700.

Thus as plaintiff in his brief states: "The test is whether there is some independent source on which a person may legitimately rely to show that he is entitled to a benefit." Plaintiff asserts that he could legitimately rely on four such sources to show his entitlement to procedural due process prior to the Board's decision not to renew his contract.

▆▆▆ The first source which plaintiff asserts as a basis for the requisite "property" interests is a rule of procedure promulgated by the Board of Trustees of Dillon School District No. 2. This procedure, however, applies to decisions of the administrative staff and not to decisions of the Board of Trustees of Dillon School District No. 2 itself. It is, therefore, clear that since the Board of Trustees, and not the administrative staff,. is charged with the duty to make the decision of whether or not to reemploy the plaintiff, this rule is not applicable to plaintiff. It therefore could not serve as a basis upon which he could assert that he had a sufficient "property" interest to entitle him to invoke the due process clause of the Fourteenth Amendment.

The second source which plaintiff asserts as a basis for the requisite "property" interest is Section 21–247 of the Code of Laws of South Carolina as amended, 1962. The main thrust of plaintiff's argument with regard to the statutory procedure is that since this statute provides for appeal to the County Board of Education by any person aggrieved by an action of the Board of Trustees, it necessarily follows that plaintiff could only be removed for cause. From this proposition the plaintiff further reasons that if this be the case, then plaintiff could rely on "state law as the basis for his liberty interest that would require the protection of the Fourteenth Amendment." While plaintiff's argument is indeed novel, it will not withstand close scrutiny. First, it must be submitted that the appellate procedure plaintiff seeks to rely upon was not the type "state law" or the "state contract law" to which the Court alluded in *Roth* and *Sindermann*. This is evident from the fact that this statute does not have as its purpose the definition of the rights of school teachers or school districts with regard to the contractual terms between them. Plaintiff reasons that the Supreme Court of South Carolina's holding in *Stanley v. Gary*, 237 S.C. 237, 116 S.E.2d 843 (1960) stands for the proposition that a school teacher's contract must be renewed absent cause. Plaintiff's reasoning is based upon the fact that the Supreme Court indicated that any action by the Board of Trustees must be at least "reasonable". The fallacy in plaintiff's argument is that the words "reasonable", "arbitrary" and "capricious" have more than one meaning in the law. Plaintiff's brief cites the case of *Johnson v. Branch*, 364 F.2d 177 (4th Cir. 1966) *cert. denied* 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967), for the proposition that school boards may not act unreasonably, arbitrarily, capriciously or unlawfully and that these concepts are at the very heart of due process. Plaintiff's argument breaks down at the point where he assumes that a pronouncement that a board must act "reasonably" necessarily means that every teacher's contract can be refused renewal only for cause. The distinction is between deprivations of "liberty" and deprivations of "property". The Seventh Circuit in the case of *Jef-*

*fries v. Turkey Run Consolidated School District*, 492 F.2d 1 (1974) in a very able opinion has pointed out this critical distinction in a somewhat different factual context.

Basically the distinction is this: If an employee who has a "property" interest in his job is discharged for exercising a constitutional right, he will have been deprived of property without substantive due process, because an unconstitutional reason is the equivalent of no reason. The decision would thus be characterized as unreasonable, arbitrary, and capricious. If on the other hand on employee who has no "property" interest in his job is discharged solely for exercising a constitutional right, he will have been deprived of "liberty" without substantive due process, because one of his constitutionally protected rights has been violated, and the discharge would still be characterized as unreasonable, arbitrary, and capricious. Thus, the words "reasonable", "arbitrary" and "capricious" must be interpreted in light of the interest which is to be protected. The administrative appellate procedure provided by the South Carolina Statute, protects a person against either of the "unreasonable" actions above. Thus, this Court cannot accept plaintiff's argument that such an appellate procedure is tantamount to the state's pronouncement that every person who meets the broad classification of "any person aggrieved by any decision of the board" has a "property interest" in the renewal of his contract sufficient to invoke the procedural due process protection afforded by the Fourteenth Amendment.

Plaintiff asserts that there was a mutual understanding that the teacher would be renewed, absent good cause not to renew his contract. While plaintiff has elicited testimony from the Chairman of the Board of Trustees to the effect that teachers would usually not be denied renewal unless there was some cause, this does not amount to the "clearly implied promise of continued employment" referred to by the Court in

*Roth.* The Court would point out that this showing by the plaintiff falls far short of the university rule or policy that was referred to in the *Roth* opinion as follows:

> "To be sure, the respondent does suggest that most teachers hired on a year-to-year basis by Wisconsin State University-Oshkosh are, in fact, rehired. But the District Court has not found that there is anything approaching a 'common law' of re-employment, see *Perry v. Sindermann*, post [408 U.S.] at 602, 92 S.Ct. 2694, so strong as to require University officials to give the respondent a statement of reasons and a hearing on the decision not to rehire him." 408 U.S. 578, n. 16, 92 S.Ct. at 2710.

Plaintiff's final argument is that because the Board of Trustees consented to give him an opportunity to appear before them at the May 22 meeting that even though no hearing was compelled by the due process clause of the Fourteenth Amendment, such hearing nonetheless must comply with the due process clause. While plaintiff cites the case of *Horton v. Orange County Board of Education*, 464 F.2d 536 (4th Cir. 1972), it must be noted that the Fourth Circuit has recently considered *Williams v. Hyde County* with facts quite similar to those of the plaintiff's case and made the following observation:

> "After receipt of the recommendation of the Advisory Counsel, the School Board notified the plaintiff and gave him an opportunity to appear. He appeared, but declined to make any meaningful statement because he contended he was entitled to an adversary hearing. He contends here that he was entitled to such a hearing. We think not, for he did not have tenure, nor any 'equivalent of tenure', *Johnson v. Fraley* (4th Cir.) 470 F.2d 179, 181." 490 F.2d at 1233.

The distinction is that in the *Horton* case the question of the necessity for a hearing was not before the Court. In the *Williams* case, supra, this question

was before the Court, and it held that because the plaintiff had no tenure, nor the equivalent thereof, the mere fact that he was allowed to appear before the Board did not mean that this alone entitled him to a full due process hearing.

This Court concludes that plaintiff did not have a sufficient "property" or "liberty" interest in the renewal of his contract to require that he be afforded procedural due process prior to defendants' decision not to renew it.

■ Plaintiff has also alleged that the Board's decision was arbitrary and capricious, because it was not based upon sufficient evidence. While this Court is firmly convinced that the evidence before the Board and its decision not to reemploy the plaintiff was clearly reasonable, there is a more fundamental reason that plaintiff cannot prevail. The Court has concluded that plaintiff lacked "property" interest in the renewal of his contract sufficient to bring his claim within the ambit of the Fourteenth Amendment's procedural due process protection, and it should be equally clear that the same reasoning applies to a substantive claim based upon a "property" interest.

It is, therefore, ordered that the complaint be and the same is hereby dismissed and judgment shall be entered for the defendants.